Wayne E. **FREEMAN**; Freeman Resources, Ltd.; FRM GP, LLC; Frank M. Bufkin, III; Buffco Production, Inc.; Twin Resources, LLC; and Chesapeake Louisiana, L.P., Appellants

v.

**HARLETON OIL & GAS, INC., Appellee**

No. 06-16-00034-CV

Court of Appeals of Texas, Texarkana.

Date Submitted: May 17, 2017

Date Decided: July 7, 2017

Rehearing Overruled August 8, 2017

John H. Boswell, Boswell & Hallmark, PC, Gene F. Creely, II, Creely Law Firm PLLC, Houston, John R. Mercy, Mercy, Carter, Tidwell, LLP, Texarkana, for Frank M. Bufkin, III; Buffco Productions, Inc.; Twin Resources, LLC.

Barton Cox, Richard S. Krumholz, Norton Rose Fulbright US, LLP, Dallas, Troy A. Hornsby, Miller, James, Miller & Hornsby, LLP, Texarkana, for Wayne E. Freeman; Freeman Resources, Ltd.; FRM GP, LLC.

Brian K. Tully, Jesse R. Pierce, Pierce & O'Neill, LLP, Houston, Collin M. Maloney, Ireland, Carroll & Kelley, PC, Tyler, for Chesapeake Louisiana, LP.

Gregory D. Smith, Smith Legal PLLC, Brent Howard, Howard & Davis, PC, Nolan D. Smith, Ramey & Flock, PC, Tyler, for Appellee.

Before Morriss, C.J., Moseley and Burgess, JJ.

## OPINION

Opinion by Justice Moseley

"In 2008, oil and gas companies descended on east Texas ... seeking to acquire leases to exploit the Haynesville Shale formation, which they viewed as having enormous potential."[1] During this frenzied period, Chesapeake Louisiana, L.P. (Chesapeake), entered into a letter agreement with Buffco Production, Inc. (Buffco), and Twin Resources, L.L.C.

---

[1]. *Petrohawk Props., L.P. v. Jones*, 455 S.W.3d 753, 759 (Tex. App.—Texarkana 2015, pet. dism'd).

(Twin), to purchase three-year term assignments in all of Buffco's and Twin's "right, title and interest in and to the lands described" in the agreement, which comprised at least 14,378 acres in four counties. The total purchase price for this transaction was $232,146,680.00, and included in the transaction were Buffco's and Twin's interests in mineral leases in a 680-acre oil and gas property located in Harrison County called the Geisler Gas Unit No. 1 (Geisler Unit).[2]

Pursuant to terms of the letter agreement, Chesapeake agreed to conduct "Title Due Diligence." It also agreed to make the same offer it had made to Buffco and Twin "to any non-operat[ing] working interest owners ... subject to Chesapeake's due diligence." Chesapeake's due diligence mistakenly concluded that Buffco and Twin owned a 50% operating working interest in the deep rights in the Geisler Unit and that Freeman Resources, Ltd., owned the other 50% non-operating working interest. In exchange for assignments to "all of Assignor's right, title and interest in and to the oil, gas and mineral leasehold" in the Geisler Unit, Chesapeake paid $13,600,000.00 each to Buffco/Twin and Freeman Resources, Ltd. Critically, Chesapeake's due diligence failed to uncover the fact that Harleton Oil & Gas, Inc., actually owned a 50% non-operating working interest to the deep rights in the Geisler Unit.

When Harleton discovered the existence of the deal between Chesapeake and Buffco/Twin, Harleton sought to recover as a third-party beneficiary of that contract. Chesapeake, which believed it had contracted to purchase 100% of the deep rights interests in the Geisler Unit, sued to recover "overpayments" made under the contract.[3] After all parties filed motions for summary judgment, the trial court entered judgment which, among other things, (1) found that Harleton was a third-party beneficiary to the letter agreement, (2) granted Harleton specific performance of the letter agreement against Chesapeake, (3) concluded that Harleton had demonstrated its entitlement to unjust enrichment claims against Buffco, Twin, and their President, Frank M. Bufkin, III (collectively the Buffco Defendants), and Wayne E. Freeman, Freeman Resources, Ltd., and FRMGP, LLC (collectively the Freeman Defendants), as a matter of law, (4) imposed a constructive trust against the Buffco and Freeman Defendants, (5) ordered the Buffco and Freeman Defendants constructive trustees of a total of $6,800,000.00 previously paid by Chesapeake under the letter agreement, and (6) ordered the Buffco and Freeman Defendants to pay Chesapeake's specific performance consideration to Harleton out of the funds held in the constructive trust.

All parties have appealed from the trial court's judgment. On appeal, the Buffco Defendants argue that the trial court erred (1) in entering judgment against Bufkin personally; (2) in failing to hold that Harleton's unjust enrichment claims

---

**2.** The description of the Geisler Unit is:

The Geisler Gas Unit No. 1 containing 680 acres, more or less, located [in] the D. Jones Survey, A-862, the D. C. Moore Survey, A-457, the H. E. Geisler [Unit] Survey, A-921, the Clyde Munden Survey, A-889, the John B. Webb Survey, A-799, the E. G. Robertson Survey, A-888, the J. B. Barton Survey, A-123, the U. S. Ussery Survey, A-723, and the E. G. Robertson Survey, A-889, Panola County Texas, being more particularly described in that certain Unit Declaration dated June 16, 1995 and recorded in Volume 1389 Page 2516, Deed Records, Harrison County, Texas.

**3.** None of the parties to this action have sought to apply the doctrine of merger to these dealings, and we will not attempt to do so.

against Buffco were barred by the two-year statute of limitations; (3) in concluding that Chesapeake overpaid; (4) in failing to enforce the letter agreement as written, (a) by ignoring the risk allocation and payment provisions, (b) in concluding that Chesapeake overpaid the Buffco Defendants, (c) in finding that any such overpayment belonged to Harleton, and (d) in undoing and restructuring a completed transaction; (5) in imposing a constructive trust on the proceeds realized from the deal by the Buffco Defendants based on the unjust enrichment claim by Harleton because (a) parties cannot recover on unjust enrichment when there is a contract, (b) the Buffco Defendants owed no duty to Harleton with regard to the deal with Chesapeake, (c) the Buffco Defendants made no misrepresentation to Harleton, and (d) the Buffco Defendants received no benefit from Harleton at Harleton's detriment; (6) in ordering the Buffco Defendants to specifically perform in the absence of any pleading against them that would entitle Harleton to specific performance against them; and (7) in determining that Harleton could enforce the letter agreement against the Buffco Defendants as a third-party beneficiary of the letter agreement.

The Freeman Defendants' appeal argues that (1) Harleton's unjust enrichment theory was barred by the statute of limitations, (2) Harleton cannot recover under an unjust enrichment theory due to the existence of a contract, (3) the Freeman Defendants were not overpaid because Chesapeake waived any title defects and was required to pay the full purchase price in accord with contractual terms, (4) the Freeman Defendants did not benefit by fraud, duress, or undue advantage, and

Harleton failed to submit any evidence showing otherwise, and (5) Chesapeake had actual notice of Harleton's interest before the transaction.

Chesapeake's appeal from the trial court's judgment challenges only the trial court's decision to allow the Freeman Defendants to retain $408,000.00 for a 3% interest in the Geisler Unit held by Freeman Capital, Ltd. (Capital). By cross-appeal, Harleton argues that Chesapeake was liable for its attorney fees.

We resolve this appeal by making the following rulings, which are dispositive of all issues brought on appeal: (1) imposition of a constructive trust on the monies received by the Buffco and Freeman Defendants for the sums received by them from Chesapeake was improper because Harleton's unjust enrichment claims were barred by the statute of limitations, (2) Chesapeake cannot recover sums from Freeman for any overpayment under the letter agreement, (3) Harleton is not entitled to recover attorney fees from Chesapeake for breach of a contract because it (being neither a primary party to the contract nor a third-party beneficiary of the contract) has no standing to enforce the letter agreement as a contract, and (4) because Harleton was neither a primary party to the contract nor a third-party beneficiary of it, the trial court was without subject-matter jurisdiction to address any breach of contract claim Harleton held against Chesapeake.[4]

Accordingly, as set forth in detail below, we reverse the trial court's judgment and render judgment that Harleton take nothing on all of its claims. In all other respects, we affirm the trial court's judgment.

---

**4.** We also determine that Frank Bufkin could not be held personally liable for all actions he took, being in a representative capacity.

## I. Factual Background and Procedural History

This appeal derives from a complex factual and procedural history, which we discuss to provide context to the parties' arguments.

### A. The Basis of Harleton's Breach of Contract Claims Against the Buffco and Freeman Defendants

#### 1. Bufkin, Buffco, Wayne, and Harleton Agree to Jointly Develop an AMI

Bufkin and Wayne E. Freeman (Wayne) had been doing business together since the 1980s. At one point, Buffco owned 100% of the working interest in the Geisler Unit leases. On February 5, 1997, it assigned 50% working interest to Wayne.

In developing the Geisler Unit leases, Buffco and Wayne decided to enter into a partnership with Harleton, an oil and gas exploration and production company. Following negotiations, Harleton entered into a letter agreement with Bufkin, as President of Buffco, on February 21, 2003, to combine their separately-owned interests into an area of mutual interest (AMI), that "[would] last until October 31, 2005." [5] This letter agreement, which Wayne also signed, is called the co-development agreement. [6]

Pursuant to this letter agreement, Buffco would operate all wells completed below the base of the Pettit Formation in the Geisler Unit, and Harleton would operate all wells in that unit which were shallower than the Pettit formation. After Harleton had completed two wells, Buffco and Freeman Resources were to assign half of their working interests (25% each) to Harleton, giving a total 50% working interest in the Geisler Unit leases to Harleton; in return, Harleton was to assign 50% working interest in certain other specified leases (the Harris leases) to Bufkin and Freeman Resources. It further clarified: "the leasehold in each unit shall remain 50% owned by [Harleton] and 50% owned by Buffco."

Bufkin described the relationship with Harleton as a partnership, stating, "[T]he terms are I would operate and we would try to go after oil and gas property together that was marginal, and not beat each— you know, not—and always try, you know, to go after properties that we think that had value."

#### 2. The Right of First Refusal is Created by a Co-Development Agreement and a Joint Operating Agreement (JOA)

The co-development agreement stated, "There will be a Right of First Refusal [the ROFR] regarding third party sales." This particular clause is the basis of Harleton's complaints against the Buffco and Freeman Defendants. The co-development agreement attached a JOA and specified that it would "govern the operation and development for these units."

The 2003 JOA stated,

Should any party desire to sell all or any part of its interests under this agreement, or its rights and interest in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser ..., the purchase price, and all other terms of the offer. The other parties

---

5. At the time of the co-development agreement, Harleton owned "the Harris leases," and Buffco owned and operated the Geisler Unit.

6. Bruce Wooldridge, President of Harleton, testified that Wayne also negotiated the co-development agreement.

shall then have an optional prior right ... to purchase on the same terms and conditions.

The terms of the JOA provided that the co-development agreement would remain in full force and effect "[s]o long as any of the oil and gas leases subject to [the] agreement remain[ed] or [were] continued in force as to any part of the Contract Area, whether by any production, extension, renewal or otherwise." As of December 9, 2014, Harleton "continue[d] to operate the [shallow] Pettit formation Geisler [Unit] #1...." The JOA was signed by Bruce Wooldridge, on behalf of Harleton as operator, Wayne, individually, and Bufkin, individually.[7]

### 3. Harleton Acquires a 50% Working Interest in the Geisler Unit

Pursuant to the terms of the co-development agreement, Bufkin and Wayne executed an assignment, effective March 1, 2003, of "50% of ASSIGNORS' right, title and interest in and to the entire estates created by the oil, gas and mineral leases" and "50% of all of Assignors' right, title and interest in ... operating agreements" to Harleton. The assignment was signed by Bufkin and Wayne individually, and was acknowledged by Buffco employee Kenneth Faires.[8] As a result of this assignment, Harleton acquired a 50% working interest in the Geisler Unit.

On January 14, 2004, Wayne executed an assignment of 3% of his interests in the Geisler Unit to Capital. In 2006, Bufkin assigned to Twin all of his working interest in oil and gas leases in Harrison County, including those which made up the Geisler Unit. On September 18, 2008, Wayne exe-

cuted an assignment (which became effective March 1, 2008) of his remaining 22% interest in the Geisler Unit to Freeman Resources.

### B. Uncontested Facts about the Geisler Unit

#### 1. Ownership

The actual ownership of the deep rights to the Geisler Unit prior to Chesapeake's involvement is wholly undisputed. Harleton owned a 50% non-operating working interest, Capital owned a 3% non-operating working interest, Twin owned a 25% operating working interest, and Freeman Resources owned a 22% non-operating working interest. The various assignments proving the actual ownership of the Geisler Unit by all four entities was duly recorded in county records prior to Chesapeake's involvement.

#### 2. Chesapeake Enters into Negotiations for the Deep Rights Covered in the Geisler Unit

In 2008, Chesapeake spoke to Bufkin about purchasing deep rights in the Geisler Unit. Bufkin retained the Shore Freeman Law Firm to represent Buffco and Twin in connection with the Chesapeake transaction. Matthew Wolcott, an attorney previously employed by Shore Freeman, assisted in drafting an agreement to memorialize the proposed sale, the content of which is described below.

Chesapeake drafted a letter agreement with Buffco and Twin dated July 31, 2008 (Letter Agreement). The Letter Agreement, which was on Chesapeake letterhead and addressed to Bufkin, proposed three-year term assignments of the deep rights

---

7. In signing his name to the JOA, Bufkin crossed out the portion of the signature line indicating that he was signing on behalf of Buffco. Thus, it appeared as if he signed the JOA in an individual capacity.

8. Also in accord with the co-development agreement, Harleton executed an assignment of its interests to Bufkin and Wayne.

to oil and gas properties (including the Geisler Unit) that were to be conveyed in three separate closings. In the Letter Agreement, Chesapeake submitted a cash offer of $232,146,680.00 for "all of Seller's right, title[,] and interest in and to the lands described" in the agreement, which was said to be comprised of at least 14,378 acres in four counties. This letter contained wording to which we refer as the non-op offer clause, stating: "Chesapeake also agrees to make this offer to any non-operat[ing] working interest owners in the Properties ("Non-Ops") under the same terms and net acre price as stated in this offer." The offer contained in the Letter Agreement was

> subject to Chesapeake's due diligence ... and the following terms and conditions:

> 1. The Leases to be conveyed by Seller to Chesapeake under the term assignments shall include approximately 10,683.58 net acres in the Counties of Harrison, Panola, and Shelby, and Seller's net revenue interest for each Lease in these counties shall be no less than seventy-five percent (75%)....

> ....

> 14. The Leases are, or will be delivered at closing, free and clear of any mortgages, liens or other encumbrances.

> 15. The three Closings shall occur at a mutually agreed location as follows:

> • for the Properties described in Exhibit A-1, on or before August 29, 2008;

> • for the Properties described in Exhibit A-2, on or before September 18, 2008; and

> • for the Properties described in Exhibit A-3, on or before October 8, 2008 (the "Final Closing").

> ....

> 17. Chesapeake shall not attempt to obtain, and shall not direct any of its agents, partners, contractors, brokers, or affiliates to attempt to obtain, any mineral rights in any unit operated by Seller for a period of 90 days after the Final Closing.

Exhibit A-2 to the Letter Agreement (which included the legal description of the Geisler Unit) contained bold lettering which maintained,

> **Seller does not represent that it owns the rights below the Cotton Valley formation in all of the lands and leases described below, and Chesapeake agrees that it will perform its own title due diligence subject to the provisions set forth in Exhibit B. Seller reserves the right to supplement this Exhibit in good faith with the intention of the parties being that Seller offer[s] to convey all rights below 100 feet beneath the base of the Cotton Valley formation in the counties listed below.**

Exhibit B to the Letter Agreement, labeled <u>Title Due Diligence</u>, stated,

> Upon reasonable advance request from Chesapeake, Seller [will] make available to Chesapeake at Seller's offices ... all existing Lease, title, contract, and legal files related to the Properties....

> ....

> .... Chesapeake will review title to the Properties prior to Closing and notify Seller in writing of any Title Defect it discovers as soon as reasonably practicable.... Chesapeake will be deemed to have conclusively waived any Title Defect about which it fails to notify Seller in writing within the applicable period....

The Letter Agreement was signed by Bufkin in his representative capacity as president of both Buffco and Twin on behalf of those entities.

### 3. An Error in Due Diligence

After the Letter Agreement was signed, Chesapeake contracted with Dwight Snell & Associates to perform the due diligence and title work associated with the agreement. Dwight Snell & Associates arranged for Don Parkins, an independent landman, to lead the team. Parkins and his team failed to uncover the true ownership interests in the Geisler Unit. Instead, they mistakenly believed that Buffco/Twin and Freeman Resources each owned a 50% working interest in the Geisler Unit.

### 4. The Chesapeake Transaction Closes

■ On September 18, 2008, Chesapeake received two assignments, one from Freeman Resources, and the other from Buffco and Twin (Chesapeake Assignments). Under the terms of each assignment, Buffco/Twin and Freeman Resources conveyed "all of Assignor's right, title and interest in and to the oil, gas and mineral leasehold" deep rights interests in the Geisler Unit, subject to certain reservations not affecting this dispute. The assignments further (1) provided that Chesapeake was "TO HAVE AND TO HOLD all and singular such Leases together with all rights, titles, interests, estates, remedies, powers and privileges ... subject to ... [t]he terms and conditions of" the Letter Agreement, and (2) stated,

> Assignor does hereby bind itself, its heirs, successors and assigns, to warrant and forever defend all and singular title to the Leases unto Assignee, Assignee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by through or under Assignor, but not

otherwise.[9] Assignor conveys the Leases free and clear of any outstanding mortgage, deed of trust, lien or encumbrance created by Assignor, but not otherwise.

During the closing, Chesapeake paid $13,600,000.00 in connection with the Geisler Unit assignment to Shore Freeman, which distributed the funds to Buffco/Twin and Freeman Resources, with each receiving $6,800,000.00.

Soon, it came to light that Chesapeake had only acquired 47% of the working interests in the Geisler Unit as a result of the Chesapeake Assignments. Harleton continued to own 50% of the working interest rights in the Geisler Unit, and Capital owned 3% of the working interests. This dispute ensued.

### C. Events Prior to, During, and After the September 18, 2008, Closing

In addition to the uncontested facts, many contested facts were presented in the exhibits attached to the parties' motions for summary judgment.

Bufkin testified that Chesapeake's interest in the Haynesville Shale was no secret and that Chesapeake approached him to express its interest in buying deep rights to many properties in which Buffco and Twin had interests. Bufkin testified that he hired Shore Freeman to negotiate and handle the Chesapeake transaction and relied on it for everything regarding the Chesapeake matter. Bufkin instructed Shore Freeman to "get Chesapeake happy with the title" and keep Freeman Resources and other non-ops in the loop.

### 1. Lack of Communications with Non-Ops

Daryl Stallings (Chesapeake's senior land negotiator and the person whose sig-

---

9. This is the classic wording used with a conveyance containing only a special warranty (as opposed to a general warranty) of title. That is to say that under a special warranty of title, the grantor warrants the grantee that it

will defend the title conveyed only as against those claiming "by, through or under" the grantor. *Paul v. Houston Oil Co. of Tex.*, 211 S.W.2d 345, 356 (Tex. Civ. App.—Waco 1948, writ ref'd n.r.e.).

nature was appended to the Letter Agreement on its behalf) and George Denny, Chesapeake's manager of business development, were intimately involved in negotiating the Letter Agreement and the Chesapeake Assignments. Stallings testified that the negotiations were strictly with Bufkin, and both Stallings and Denny clarified that neither ever spoke with the Freeman Defendants or any other non-ops before entering into the Letter Agreement. Stallings and Denny did nothing to obtain a non-op agreement prior to the sale because they both said they believed paragraph 17 of the Letter Agreement prevented them from contacting the non-ops.

According to Stallings, "[A]t each closing, [Bufkin] would bring certain parties that were his partners or working interest owners in the [Geisler Unit] to—to make those available for the closing under the same offers that he got. That was our understanding." Stallings confirmed that "[i]f [non-ops] came to the closings with their property, they had the same offer as Buffco did."

Wayne testified that he did not communicate with Bufkin about the Chesapeake transaction and said he first heard about it through Shore Freeman, where one of his sons, Vance Freeman, was a shareholder.[10] Wayne testified that he was never asked to provide documentation relating to title and that he had no communication with Bufkin,

Chesapeake, Harleton, or Parkins in the months leading up to the closing. Wayne created Capital's 3% interest in the Geisler Unit, but testified that he did not speak to Brandon or Capital because it never occurred to him to do so.[11] Although Wayne knew of the actual ownership interest in the Geisler Unit,[12] he did not raise the issue at closing. Since he believed that diligence regarding title had been completed by Chesapeake, it did not occur to him to do so. Wayne indicated that he believed Chesapeake was purchasing whatever interest Freeman Resources had, and "[t]o [him], that was Chesapeake's obligation to figure out who owned what in that unit."[13] Wayne averred that he "never made any representations or warranties to Chesapeake regarding the percentage of working interest that [he] or any of [his] companies owned in any of the properties."

### 2. Reliance on Bufkin and Shore Freeman

According to Stallings, Bufkin "knew what he owned" and "misrepresented what he owned." Stallings said Chesapeake hired Dwight Snell & Associates because it was "trying to verify what was represented to [it] by Frank Bufkin." Stallings testified that Chesapeake knew of neither Harleton's nor Capital's interest in the Geisler Unit prior to the September 18 closing. Stallings stated, "We were relying on [the due diligence] and the representations of the agent for Buffco, which was

10. According to Wayne, although Vance signed the assignment to Chesapeake on Wayne's behalf, Shore Freeman did not represent Wayne or Freeman Resources in the transaction. Wayne clarified that Freeman Resources is a family limited partnership, that he is a majority interest owner in the partnership, and that Vance and his other son, Brandon Freeman, owned the remaining partnership interest.

11. Brandon testified that he did not learn of the Chesapeake transaction until he was sued by Harleton.

12. Wooldridge also testified that Wayne was aware of the actual ownership interests in the Geisler Unit.

13. Wayne later stated in his affidavit that he was neither consciously aware of nor did he remember that Harleton and Capital had interests in the Geisler Unit at the time of the closing.

the Shore Freeman law firm, who also confirmed that they owned 50 percent each, Freeman and Buffco." [14]

The confirmation from Shore Freeman to which Stallings referred came in the form of a few emails. Parkins had initially mistakenly determined that a portion of the interests in the Geisler Unit were owned by PetroShore. In discussing the monies to be paid at closing, an August 25, 2008, email from Stallings to both Wolcott and Bufkin stated, "I am assuming this amount includes the Non-ops working interest owners.... Petro Shore et cetera." The email from Stallings showed that Shore Freeman "stated [it] would disburse to all from your Trust account for simplicity purposes." When Shore Freeman received notification that PetroShore might have an interest in the Geisler Unit, on September 9, 2008, Wolcott emailed Stallings, writing, "This shows that Petro Shore acquired 50% of the Geisler [Unit] GU in 1997. I haven't checked further but did not think that Petro Shore had anything in that unit, and I know they weren't around in '97. Is this a typo?" [15] Because it was discovered that PetroShore had no interest in the Geisler Unit, Parkins assumed Shore Freeman would correct further mishaps.

Stallings also believed that Bufkin would correct "title failure[s]." Stallings testified that Chesapeake did not close on other properties owned by the Buffco Defendants because Bufkin called Chesapeake to report title issues, adding that he was not ready to close. Stallings testified, "[Bufkin] withheld many of those units because they had title problems." Stallings acknowledged that Chesapeake's failure to point out title defects conclusively waived the

title defect. Yet, he characterized the failure to own title as a "title failure," not a title defect, such as a mechanic's lien or other encumbrance. According to Stallings, if Chesapeake knew that Harleton had an interest in the Geisler Unit, he would have halted the transaction because of a title failure and would have instructed the sellers to work out title issues. Stallings confirmed that Chesapeake would have had no problem paying Harleton because Chesapeake "was obligated to offer through Frank Bufkin to Harleton their interest— the same offer we made to everyone else."

On September 16, 2008, Stallings emailed Wolcott attaching the due diligence update and writing, "Here you go Matt ... please check our numbers and let me know what you think ... Don Parkins is available if you need him for questions." On September 17, 2008, Wolcott attached "an updated breakdown showing each individual [working interest] owners allocation" and a revised price allocation spreadsheet to Stallings and Bufkin indicating that Freeman Resources was to receive $6,800,000.00 for its interest in the Geisler Unit. Bufkin testified that he reviewed the allocations on the spreadsheet, but did not check them for accuracy. Denny testified, "[I]t's obvious that record title reflected differently [than] what Mr. Bufkin had said. If Mr. Bufkin had told him the truth, then there wouldn't have been a problem. [Parkins] could have gone back to the record and found the assignment."

### 3. Harleton Claims that Chesapeake Knew of its Interest in the Geisler Unit

Harleton, however, argued that Chesapeake knew of its interest in the Geisler

---

14. In response to requests for admissions, Harleton admitted that it knew of no facts or documents indicating or suggesting that Shore Freeman was an authorized agent of Wayne, Freeman Resources, FRM, or Capital.

15. Wolcott said he did not remember correcting Parkins' title reports.

Unit prior to its closing under the Letter Agreement and breached the Letter Agreement by failing to make an offer to Harleton. On July 28, 2008, Bruce Ogilvie, a contract landman for Harleton, received an email from Chesapeake's Land Negotiator, Steve McMillen, to see if Ogilvie knew of any available acreage in Panola and Shelby Counties. Copying Wooldridge, Ogilvie responded, "Harleton owns several units scattered around Panola & Harrison Cos. I think you would be interested in the ... G[ei]sler GU (S. Harrison Co.)." In response, McMillen, copying everyone on the chain e-mail, asked Ogilvie to provide all "units, surveys & net acres NRI owned by Harelton [sic]" for deep rights, which Ogilvie agreed to do. According to Ogilvie, Chesapeake did not communicate any offer to buy Harleton's interest in the Geisler Unit at that time. The entire email chain (which also was sent to Chesapeake's landman in the Louisiana division, Jack Elliott) was forwarded to Denny on September 3, 2008, prior to the closing of the Letter Agreement. When presented with evidence that the email chain had been transmitted, Stallings testified that he believed that Elliott knew of Harleton's interest in the Geisler Unit, but that Elliott's and McMillen's knowledge about Harleton's interest was not relayed to him. He also testified that he was not otherwise aware whether Denny had actually read the email chain prior to the closing.

### 4. The Mistake is Uncovered

According to the Affidavit of Wooldridge (an owner of a 50% interest in Harleton and its President), Harleton discovered in November 2008 that Chesapeake had agreed to the non-ops offer clause in the Letter Agreement. Wooldridge learned of the sale and the Chesapeake Assignments and called a representative of Chesapeake, who advised him that they had purchased a 100% working interest in the Geisler

Unit deep rights. "Ogilvie [also] talked to others at Chesapeake, including Daryl Stallings, who confirmed that Chesapeake had paid [Buffo/Twin and Freeman Resources] for the Harleton interests." Wooldridge had no further discussions with anyone representing Chesapeake and made no attempt at that time to compel Chesapeake to purchase Harleton's interest in the deep rights of the Geisler Unit.

In his deposition, Parkins explained his mistake. He testified that he arrived at Buffco and was provided with the Buffco file on the Geisler Unit, which had nothing in it referencing Harleton at all. Parkins stated, "I was waiting on files from Ken Faires to retrieve them one day. I walked out into their lobby and I saw Ken pilfering the folders. So he wasn't going in there and just grabbing a folder and bringing it to me. He was going through the folders and giving me what he wanted." Parkins said he believed in hindsight that Faires had been removing documents from the files. To double-check his work, Parkins obtained division orders from Bufkin's office printed on July 23, 2008, to see what royalties and working interests were being paid out at the time. According to Parkins, the division orders listed the working interest owners as 50% Twin and 50% Freeman Resources. Parkins testified that the co-development agreement and assignments to Harleton in the Geisler Unit were not presented by the Bufkin Defendants because "they did not want [him] to see [them]."

Parkins did not check the county records, saying that he was told by Bufkin and Shore Freeman that his title determination was correct. When he uncovered the error and revealed Harleton's ownership interest to Bufkin in November 2008, Bufkin told Parkins that Buffco's assignment to Harleton must have been a mistake because the assignment was only supposed

to be "for a single wellbore." When Parkins informed Bufkin of the nature of the assignment, Bufkin stated that he needed to correct the assignment to reflect a "wellbore-for-wellbore" transaction. Parkins asked Bufkin to address the problem.

### 5. Bufkin Reaches out to Harleton in an Attempt to Correct the Mistake

Bufkin testified that he was surprised by the news of Parkins' mistake. He claimed that he forgot about the assignments to Harleton, was unaware of Harleton's interest, believed that Buffco/Twin and Freeman Resources each had a .50% interest in the Geisler Unit at closing, and had counted on Chesapeake to properly conduct the due diligence which the terms of the contract mentioned. Bufkin had no communications with Chesapeake about the error. Instead, because Parkins was concerned about getting fired and asked Bufkin to help, Bufkin decided to call Harleton to engage in "shop talk about helping Harleton get paid."

Wooldridge stated that after the Chesapeake Assignments were signed, Bufkin called Jerry Irwin (Harleton's other 50% owner and its Vice-President), telling Irwin that he (Bufkin) had an opportunity to sell Harleton's Geisler Unit deep rights. According to Irwin, "Bufkin indicated that he wanted a commission of some sort on the sale." Both Wooldridge and Bufkin testified that mention of Chesapeake never arose during the conversation. Bufkin testified, "[Eventually,] we discussed the possibility of getting their Geisler interest in a sale." Based on Bufkin and Irwin's discussion, Harleton proposed a letter of intent on Harleton's letterhead dated December 11, 2008, (Harleton Proposal), containing proposed terms for the "Term Assignment of Oil and Gas Leases Geisler Gas Unit No. 1." The Harleton Proposal stated a purchase price of $15,000.00 an acre and provided:

> Assignee has offered and Assignor has agreed to execute a Term Assignment of Oil and Gas Leases ... covering Assignor's leasehold and/or mineral interest in the Contract Lands. It is the intent herein to assign all of Assignor's leasehold interest below the base of the Cotton Valley Sand formation in the Contract Lands whether correctly described or not.

> .... This letter and Assignment is subject to the confirmed sale of the Contract Lands between Buffco and Chesapeake Exploration, L.L.C. Should this sale fail to take place, this letter agreement shall be considered null and void with no further obligations to either party herein. ..

On behalf of Harleton, Wooldridge signed the Harleton Proposal and delivered it to Bufkin at Buffco's company Christmas Party. Wooldridge and Ogilvie both stated that they met with Bufkin in January or February of 2009 to discuss the Harleton Proposal, but that Bufkin was not sure if he would sign it and "was not sure that he owed Harleton anything."

According to Parkins, Bufkin, who was supposed to be resolving the matter, strung him along until February 2009, at which time Parkins called Chesapeake to admit his mistake. Parkins clarified that he never dealt with Wayne.

### 6. Why the Harleton Proposal Failed

Bufkin explained the reason for the $15,000.00 per acre figure contained in the Harleton Proposal, saying that he believed that Chesapeake would pay and Harleton would accept $15,000.00 per acre, representing that he was simply trying to facilitate a deal between them. Bufkin testified that he did not sign the Harleton Proposal because he was no longer going to pur-

chase their interest in the Geisler Unit. He informed Harleton that the deal was a "no go" on January 23, 2009.

Harleton had a different opinion as to the reason the Harleton Proposal failed. After it fell through, Ogilvie spoke with Wayne, who said that the Chesapeake transaction was "Frank Bufkin's deal." Harleton suggested that Bufkin made the $15,000.00 per acre offer so that he could pocket the $5,000.00 per acre difference between the Harleton Proposal and the amount that Chesapeake had already paid. According to Rodney Schultz (who identified himself as a petroleum engineer and Former Senior Reservoir Engineer for ConocoPhillips oil company and its project engineer charged with completing gas projects in Texas, including East Texas deep wells), "natural gas prices fell by over fifty percent" between July 2, 2008 and January 15, 2009.[16] By January 14, 2009, it appeared that the price to acquire interests in the Haynesville Shale had further plummeted to $2,500.00 per acre.

### 7. Harleton Argues Breach of the ROFR

Harleton believed that the entire problem could have been avoided had the Buffco and Freeman Defendants tendered Harleton the right of first refusal contained in the co-development agreement and the attached JOA. The ROFR operated in a manner that would have allowed Harleton to step into Chesapeake's shoes.

The Buffco and Freeman Defendants argue that Harleton suffered no damages as a result of any breach of the ROFR. In his deposition, Wooldridge stated that he would have considered purchasing the Buffco and Freeman Defendants' interests in the Geisler Unit for the purposes of reselling the interests. Although he had no evidence that he could have gotten more than $20,000.00 per acre from a third party, he speculated that he could have sold the Geisler Unit interests to Chesapeake, but he admitted that he would have lost money if he could not sell the interests to Chesapeake. He further admitted that he had no discussions with Chesapeake about the amount they would have been willing to pay for 100% working interest in the Geisler Unit and only speculated that he would have been able to turn a profit had he purchased the Buffco and Freeman Defendants' interests at $20,000.00 per acre.[17] Later in the deposition, the following discussion ensued:

> Q [By Counsel for Freeman Defendants] If Mr. Freeman or Mr. Bufkin had come to you on or before July 30, 2008 and said do you want to buy our interest for somewhere—for $20,000 per ace in connection with the Geisler Unit, would you have said yes or no?
>
> A [By Wooldridge] I would have said no.[18]

At that point, Wooldridge clarified that he would have purchased the Buffco and Freeman Defendants' interests at

---

16. Wooldridge testified that he would not have satisfied with $15,000.00 had he known that the Buffco Defendants received $20,000.00 per acre for their interest in the Geisler Unit from Chesapeake.

17. Stallings testified that Chesapeake would not have accepted an offer to sell over $20,000.00 per acre.

18. In responses to requests for admissions, Harleton stated, "[I]f Freeman Resources had informed Harleton, in satisfaction of some right of first refusal, that Freeman Resources intended to assign its working interest in the Geisler [Unit] to Chesapeake for $20,000 per net acre on July 31, 2008, Harleton would have elected to purchase Freeman Resources' interests in the Geisler [Unit] for $20,000 per net acre."

$15,000.00 per acre, with the intention of reselling them to Chesapeake.

Harleton argued that notice of the Chesapeake transaction would have made Harleton aware of a potential sale. Wooldridge stated, "Had Chesapeake ever communicated an offer to buy Harleton's Geisler [Unit] working interest for $20,000 per net acre, Harleton would have accepted the offer and tendered the necessary term assignments.... [and] would have appeared at the scheduled closing ready, willing, and able to convey the necessary term assignment."

Bufkin testified that he did not offer Harleton the ROFR because, although his signature was on the documents that created that right and the JOA governed his dealings with Harleton, he was unaware that it existed. Bufkin stated that the obligation to offer the ROFR belonged to Chesapeake, Shore Freeman, or someone else. At trial, the Buffco Defendants argued that the co-development agreement and the JOA had expired. Wooldridge disagreed, stating that although the AMI expired, the agreements were still in place because Harleton was still operating and producing under the terms of the agreements. He explained,

> While rights of refusal may be time-limited, they need not be so. Based upon my decades of experience in the industry, rights of refusal restricting the sales of oil-and-gas working interests commonly don't come with any calendar-date expiration period. Rather, as is commonly understood in the industry, such rights continue in force for so long as the party burdened with right of refusal owns the subject working interest.

Wayne also testified that although the AMI expired, the obligations under the co-development agreement and the JOA were ongoing because Harleton was still producing pursuant to the terms of these agreements. However, Wayne contradicted that statement in a later affidavit in which he said that he was under the impression that the co-development agreement had expired in 2005, that he had "no recollection of ever signing a joint operating agreement covering the Geisler [Unit] and, prior to the inception of this litigation, was firmly of the belief that no such [JOA] existed," and that he would have offered the ROFR to Harleton if he believed that it applied.

### 8. Bufkin Keeps Money as an "Offset" for Money Chesapeake Owes Buffco

Stallings testified that the purchase price paid by Chesapeake at the closing was "based on what was presented to [Chesapeake]." According to Stallings, "The agent for them [ (Shore Freeman) ] was—was to disp[e]rse those funds to the non-ops. That was our understanding." Stallings "assumed that if Frank Bufkin knew about Harleton, he certainly would have disbursed [the funds] to them, regardless what [their] ownership [said]."

While Bufkin maintained that although the Buffco Defendants did not warrant title in their conveyance to Chesapeake, he believed that at the time they were signed, Chesapeake was being transferred all deep rights to the Geisler Unit at closing. Bufkin testified that Chesapeake had failed to close on other properties and that he was holding half of the money they paid to Buffco/Twin for their interest in the Geisler Unit as an "offset of what [Chesapeake] owe[d]" him for those other transactions.[19]

---

19. Bufkin clarified this matter several times by stating (1) "We have other business with my counsel that we're discussing with them of a contract they did not honor. So I'm describing that money as an offset."; (2) "I've not been overpaid on the Geisler Unit. That money is an offset for this other contract."; and

Because the matter could not be resolved, litigation ensued.

### D. Prior State Court and Federal Court Lawsuits

Initially, Harleton sued the Buffco Defendants, Freeman, Freeman Resources, FRM GP, LLC, and Capital on April 22, 2009, in the 71st Judicial District Court of Harrison County, Texas. The causes of action raised in that state court suit were breach of the ROFR in the co-development agreement, fraud, and fraudulent inducement. Harleton later non-suited all of its claims, choosing to prosecute them by intervening in a lawsuit filed by Chesapeake in federal court.

The federal litigation began when Chesapeake sued Buffco, Twin, the Freeman Defendants, and Capital. Harleton intervened in the federal litigation, asserting the same causes of action it had previously asserted in state court and adding (1) Bufkin as a defendant, (2) a cause of action for breach of the Letter Agreement, (3) a claim that "some" of the Defendants "intentionally and consciously concealed the working interest" of Harleton by failing to produce documents that would have shown Harleton's interest, and (4) a cause of action for tortious interference.

Chesapeake settled its issues with the Buffco Defendants as set out in the federal lawsuit, part of which involved the dismissal of Chesapeake's claims against them. Prior to trial, Judge Rodney Gilstrap issued a memorandum opinion and order on the parties' motions for summary judgment. The order included the following language:

- "In the Court's opinion, the Non-Ops Clause clearly means that Chesapeake intended to acquire all of the leasehold estate beneath the properties described in the Exhibits. This is further borne out by other provisions in the Letter Agreement which call for delivery of not less than a full 75% net revenue interest in each unit to be acquired by Chesapeake."

- "Both Chesapeake and Buffco understood that any third-party ownership must be established and thereupon those parties would receive the same offer."

- "[B]oth Chesapeake and Buffco[ ] underst[ood] that third-party ownership interests indeed existed and would need to be verified in order to properly effectuate the Non-Ops Clause."

- "[T]he parties understood that non-operating interest owners would benefit from the Letter Agreement."

- Chesapeake, Buffco, and the Freeman Defendants had constructive notice of the ownership in the public records, and "the evidence establishes that Buffco and the Freeman Defendants also had actual notice of these interests."

- As partners in the Geisler Unit, "there was a relationship of trust between Buffco, Freeman, Freeman Capital, and Harleton," and Buffco and the Freeman Defendants took "undue advantage [which] created an unjust enrichment."

- The Freeman Defendants and Buffco "conveniently ignored the known and established status of Harleton and Freeman Capital."

- Because the Co-development Agreement expired by its own terms, no ROFR existed.

- Since Harleton said it would not have bought the interest in the Geisler Unit, any claim that it was dam-

(3) that he was underpaid because of money Chesapeake still owed under other contracts.

aged by the failure to assert ROFR was "completely hollow and of no effect."

Among other things, Gilstrap imposed a constructive trust for the benefit of Harleton on $6,800,000.00 held by Buffco and the Freeman Defendants and on $408,000.00 held by Capital; Gilstrap further ordered specific performance of the Letter Agreement by requiring Harleton to execute an assignment of their rights in the Geisler Unit to Chesapeake. Although Gilstrap's ruling was vacated after an appeal to the United States Fifth Circuit Court of Appeals and the case, with respect to the Geisler Unit, was dismissed for want of jurisdiction, Gilstrap's ruling was adopted by the trial court in this case, as further detailed below.

### E. This Lawsuit

After Gilstrap's ruling was vacated, Harleton initiated suit June 18, 2012, in the 71st Judicial District Court of Harrison County, Texas. In that suit, Harleton asserted claims against the Buffco Defendants, the Freeman Defendants, Chesapeake, Freeman GP, Inc., and Capital, but raised no claim for unjust enrichment in that first pleading.

Harleton amended its petition March 23, 2015, wherein it omitted Capital and Freeman GP, Inc., as parties, asserted a cause of action against Chesapeake for breach of the non-ops clause, and sought the remedy of specific performance against Chesapeake. In that same petition, Harleton brought forth claims against both the Buffco and Freeman Defendants, wherein it asserted breach of the ROFR in the co-development agreement and the JOA, negligent misrepresentation, and unjust enrichment and sought the imposition of a constructive trust. Against only the Buffco Defendants, Harleton alleged common-law fraud, seeking damages, exemplary damages, and attorney fees for breaches of

contract pursuant to remedieis under Chapter 38 of the Texas Civil Practice and Remedies Code.

Chesapeake answered Harleton's suit, arguing that Harleton lacked standing or capacity to sue because it was not a third-party beneficiary to the Letter Agreement, or alternatively, that Harleton failed to tender performance under the agreement.

The Buffco Defendants' amended answer argued that Harleton's claims were barred by the statute of limitations and that Harleton failed to meet the prerequisites required to obtain attorney fees, as set forth in Chapter 38 of the Texas Civil Practice and Remedies Code.

The Freeman Defendants' answer likewise sought to interpose the statute of limitations as a defense, and asserted, further, that (1) the ROFR had expired, (2) some of the Freeman Defendants were wrongfully sued because they did not have an interest in the Geisler Unit, (3) they had no duty to inform Harleton of the Chesapeake transaction, and (4) Harleton failed to meet the prerequisites required to obtain attorney fees, as set forth in Chapter 38 of the Texas Civil Practice and Remedies Code.

Chesapeake, which had settled claims relating to the Geisler Unit with the Buffco Defendants in the federal suit, filed cross-claims against the Freeman Defendants for breach of the Letter Agreement, unjust enrichment/failure to refund, breach of the warranties included in the Chesapeake Assignments, and misrepresentation of their ownership interest. The Freeman Defendants answered Chesapeake's cross-claims, asserting, among other things, that they were barred by Chesapeake's assumption of the risk as set forth in the due diligence portions of the Letter Agreement.

## F. The Parties' Motions for Summary Judgment

Harleton filed a traditional motion for partial summary judgment on its contractual claims (breach of ROFR and breach of the Chesapeake Letter Agreement), its assertion that it was entitled to specific performance of the Letter Agreement, and the issue of attorney fees. It further argued that the existence of contracts did not preclude unjust enrichment, that the money for its interest in the Geisler Unit "equitably should come from the overpayments Buffco and Freeman hold," and that Harleton could recover these funds "as a restitutionary remedy *and* as a remedy for unjust enrichment."

The Freeman Defendants filed a traditional motion for summary judgment, arguing that the statute of limitations barred Harleton's unjust enrichment and negligent misrepresentation claims, and, alternatively, a no-evidence motion based on Harleton's admission that the Freeman Defendants never made any misrepresentations to Harleton. The Freeman Defendants also filed a no-evidence motion for summary judgment against Harleton (1) on Harleton's unjust enrichment claims, arguing that they were not overpaid since (a) Chesapeake conclusively waived any title defects, (b) they were not holding any money that belonged to Harleton, and (c) there was no special trust or fiduciary relationship entitling Harleton to recover; and (2) on Harleton's breach of contract claims, arguing that the ROFR expired, or alternatively, (a) Harleton had no evidence that it was damaged by any breach of the ROFR, or (b) Harleton was not entitled to summary judgment for any breach of the ROFR because there was a genuine issue as to whether Harleton would have purchased the Freeman and Bufkin Defendants' interests in the Geisler Unit even if it had been granted the right to match the offer to purchase that had been tendered. In their response to Harleton's motion for summary judgment, the Freeman Defendants also argued that Chesapeake knew of Harleton's interest in the Geisler Unit before closing and that Harleton was attempting to hold the Freeman Defendants liable for Chesapeake's breach of the Letter Agreement.[20]

Chesapeake filed its own no-evidence motion for partial summary judgment, arguing that (1) Harleton was not a third-party beneficiary to (and could not enforce) the Letter Agreement, (2) Harleton never accepted the terms of the Letter Agreement, and (3) Chesapeake Operating was not a party to the Letter Agreement. Chesapeake also filed a traditional motion for summary judgment against the Freeman Defendants, arguing that the conveyances were warranty deeds, and that it conclusively established that the Freeman Defendants breached the warranty provisions of the Chesapeake Assignment. Chesapeake also argued that its unjust enrichment claim and money had and received claim were both conclusively established.[21]

The Freeman Defendants filed a motion for summary judgment against Chesapeake, arguing that (1) Chesapeake's breach of contract and breach of warranty claims were barred because it had conclusively waived all title defects and had paid for a deed of whatever interest the Freeman Defendants had in the Geisler Unit; (2) Chesapeake offered no evidence of fraud; (3) Chesapeake's mutual mistake

---

**20.** The Freeman Defendants also raised several objections to Harleton's summary judgment evidence.

**21.** The Freeman Defendants objected to Chesapeake's summary judgment evidence, including the admission of Gilstrap's vacated ruling.

claims were barred by the due diligence provisions in the Letter Agreement; and (4) Chesapeake's unjust enrichment claim was barred (a) due to the existence of a valid contract, (b) because the Freeman Defendants were holding no money belonging to Chesapeake, and (c) because Chesapeake knew of Harleton's interest prior to closing.

The Bufkin Defendants filed a cross-motion for summary judgment, arguing that Bufkin was not individually liable because he was a party to neither the co-development agreement nor the Letter Agreement and that Twin was not a party to the co-development agreement. The Bufkin Defendants further argued that Harleton's unjust enrichment and negligent misrepresentation claims were barred by the statute of limitations, unjust enrichment was not an independent theory of recovery, the ROFR was not breached, there was no duty to disclose the Chesapeake transaction, attorney fees could not be recovered against Twin, and there was no basis for awarding attorney fees.[22]

### G. The Trial Court Adopts Gilstrap's Vacated Ruling

After a hearing, the trial court "adopt[ed] the ruling of . . . Gilstrap." The order granting partial summary judgment first established (1) that all parties had filed motions for summary judgment; (2) that Harleton was seeking summary judgment relief on its claims against all parties, except for (a) its claim for negligent misrepresentation against the Freeman Defendants and (b) its claim for fraud and misrepresentation against the Bufkin Defendants; (3) that Buffco, the Freeman De-

fendants, and Chesapeake all sought summary judgment on all of Harleton's claims against them; (4) that the Freeman Defendants sought summary judgment on all of Chesapeake's claims against them; and (5) that Chesapeake sought summary judgment on its claims for breach of warranty, breach of contract, unjust enrichment, and money had and received against the Freeman Defendants.

The trial court granted the Buffco Defendants' and the Freeman Defendants' motion for summary judgment "seek[ing] a dismissal of Harleton's claims for breach of the" ROFR. It also granted the Freeman Defendant's no-evidence motion for summary judgment on Harleton's negligent misrepresentation claims and Chesapeake's "refund" claims. The trial court denied Chesapeake's motion for summary judgment against the Freeman Defendants and noted that Harleton abandoned its claims against Chesapeake Operating.[23]

### H. Harleton's Claims for Fraud and Misrepresentation against the Buffco Defendants are Severed and Abated

Because Harleton's fraud and misrepresentation claims against the Buffco Defendants were still pending, the trial court's summary judgment was not a final ruling. In order to create a final, appealable order, Harleton filed a motion to sever and abate these claims, which the trial court granted. The severance provided the mechanism that allowed the trial court to enter a final judgment in this case.

### I. Final Judgment and Motions for New Trial

22. The parties also filed numerous responses and replies to the motions for summary judgment.

23. Chesapeake objected to the court's summary judgment ruling, arguing that the trial

court had failed to decide the raised issue of whether $408,000.00, which it paid for Capital's interest, should be refunded by the Freeman Defendants.

The trial court's final judgment decreed the Buffco and Freeman Defendants[24] constructive trustees of the $6,800,000.00 paid by Chesapeake for the Geisler Unit and decreed Harleton the constructive beneficiary. It ordered specific performance of the Letter Agreement (which it ruled required Harleton to sign a three-year term assignment of its interests in the Geisler Unit to Chesapeake) and ordered the Buffco and Freeman Defendants to pay over and deliver the money held in the constructive trust to Harleton. The judgment dismissed Chesapeake's claims for overpayment, Harleton's claims for breach of the ROFR, Harleton's claims against Chesapeake Operating, and Harleton's claims against the Freeman Defendants based on the theory that Wolcott and Shore Freeman represented the Freeman Defendants. The trial court further denied all claims and causes of action that were not severed, including Harleton's claim for attorney fees.

The Freeman and Buffco Defendants filed motions for new trial, which were denied. Among other things, the Freeman Defendants argued that Harleton's "unjust enrichment or constructive trust" claims were barred by the two-year statute of limitations. The Buffco Defendants further objected to the inclusion of relief against Bufkin, pointing out that all of the actions attributed to him were done in his capacity as an officer of the two entities making up the other Buffco Defendants. When their motions for new trial were denied, this appeal ensued.

## II. Standard of Review

"We review grants of summary judgment de novo." *First United Pentecostal Church of Beaumont, d/b/a the Anchor of Beaumont v. Leigh Parker*, 514 S.W.3d 214, 219 (Tex. 2017) (citing *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015)). "In our review we take as true all evidence favorable to the non-movant, indulge every reasonable inference in favor of the non-movant, and resolve any doubts in the non-movant's favor." *Id.* (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005)).

"When a party moves for both traditional and no-evidence summary judgments, we first consider the no-evidence motion." *Id.* (citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004)). "If the non-movant fails to meet its burden under the no-evidence motion, there is no need to address the challenge to the traditional motion as it necessarily fails." *Id.* (citing *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013)). "Thus, we first review each claim under the no-evidence standard." *Id.* "To defeat a no-evidence motion, the non-movant must produce evidence raising a genuine issue of material fact as to the challenged elements." *Id.* at 220 (citing *Ridgway*, 135 S.W.3d at 600). "A genuine issue of material fact exists if the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Id.* (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "The evidence does not create an issue of material fact if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Id.* (quoting *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 875 (Tex. 2014)).

"Any claims that survive the no-evidence review will then be reviewed under the traditional standard." *Id.* at 219–20. "A

---

**24.** It is noted that Frank Bufkin, III (individually), was included among the Buffco Defendants.

traditional motion for summary judgment is granted only when the movant establishes there are no genuine issues of material fact and it is entitled to judgment as a matter of law." *Tipps v. Chinn Expl. Co.,* No. 06-13-00033-CV, 2014 WL 4377813, at *2 (Tex. App.—Texarkana Sept. 5, 2014, pets. denied) (mem. op.) (citing *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex. 2009)).

"Where, as here, both parties file dispositive cross motions for summary judgment and the court grants one and overrules the other, the appellate court has jurisdiction to review both the grant and the denial." *Id.* (citing *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.,* 253 S.W.3d 184, 192 (Tex. 2007). In such a case, "we are to review the summary judgment evidence presented by each party, determine all questions presented, and render judgment as the trial court should have rendered." *Id.* (citing *Comm'rs Court v. Agan,* 940 S.W.2d 77, 81 (Tex. 1997); *Nash v. Beckett,* 365 S.W.3d 131, 136 (Tex. App.—Texarkana 2012, pet. denied)).

### III. Imposition of a Constructive Trust Against the Buffco and Freeman Defendants Was Improper Because Harleton's Unjust Enrichment Claims Were Barred by the Statute of Limitations

#### A. The Law of Constructive Trusts

"A constructive trust is a creation of equity intended to prevent a wrongdoer from profiting from his wrongful acts." *Lee v. Holoubek,* No. 06-15-00041-CV, 2016 WL 2609294, at *6 (Tex. App.—Texarkana May 6, 2016, no pet.) (mem. op.) (citing *Gray v. Sangrey,* 428 S.W.3d 311, 315 (Tex. App.—Texarkana

2014, pet. denied)). "A constructive trust is a remedy—not a cause of action." *Sherer v. Sherer,* 393 S.W.3d 480, 491 (Tex. App.—Texarkana 2013, pet. denied) (citing *Meadows v. Bierschwale,* 516 S.W.2d 125, 131 (Tex. 1974); *In re Estate of Arrendell,* 213 S.W.3d 496, 504 (Tex. App.—Texarkana 2006, no pet.)). Therefore, "[a]n underlying cause of action such as a breach of fiduciary duty, conversion, or unjust enrichment is required. The constructive trust is merely the remedy used to grant relief on the underlying cause of action." *Id.*

"The trial court may impose a constructive trust 'when one party commits fraud or breaches a confidential relationship.'" *Lee,* 2016 WL 2609294 at *6 (quoting *In re Marriage of Nolder,* 48 S.W.3d 432, 434 (Tex. App.—Texarkana 2001, no pet.)). "In addition to either actual fraud or the breach of a confidential relationship, the imposition of a constructive trust requires unjust enrichment of the wrongdoer and the identification of a specific res that can be traced back to the original res acquired by fraud or breach of a confidential relationship." *Id.* (citing *Gray v. Sangrey,* 428 S.W.3d 311, 315 (Tex. App.—Texarkana 2014, pet. denied)).

#### B. Initial Matters

Initially, we note that Harleton (1) severed its claims for fraud and misrepresentation against the Buffco Defendants, (2) did not appeal the trial court's decision granting summary judgment in the Freeman and Buffco Defendants favor on breach of the ROFR, and (3) did not appeal the trial court's decision to grant the Freeman Defendants' no-evidence motion for summary judgment on Harleton's negligent misrepresentation claims[25] against

---

25. In its briefing, Harleton attempts to revive claims that the Shore Freeman Law firm made misrepresentations that could be imput-

ed to the Freeman Defendants. The trial court granted summary judgment in favor of the

them. Harleton also filed no pleading based on the breach of a fiduciary or confidential relationship.[26] Thus, the only cause of action pled by Harleton that could support the imposition of a constructive trust is unjust enrichment.[27]

 Next, we address Harleton's argument that the statute of limitations issue was "waived–twice" by the Buffco and Freeman Defendants. Both the Buffco and Freeman Defendants pled the affirmative defense of limitations and moved for summary judgment on the ground that the two-year statute of limitations had passed. Harleton responded to these arguments by arguing that (1) it had continuously pled facts that could give rise to a claim for unjust enrichment, (2) Harleton's federal summary judgment motions and filings alleged unjust enrichment, (3)

Harleton's claims in intervention in the federal suit related back to the day Chesapeake filed its complaint in the federal litigation, (4) Harleton's second state court suit was timely, pursuant to Section 16.064 of the Texas Civil Practice and Remedies Code, because it was filed within sixty days of the date of the dismissal of the federal suit, (5) the discovery rule [28] and the doctrine of fraudulent concealment apply, because Harleton did not learn of the Chesapeake transaction until January or February 2009, and (6) limitations was equitably tolled.[29]

The Buffco Defendants replied to these arguments and argued that none of Harleton's theories saved their unjust enrichment claim from the application of the statute of limitations because (1) Harleton

Freeman Defendants on this issue, and Harleton did not appeal that issue.

26. A confidential relationship may be a formal fiduciary relationship, such as between partners, or may arise informally "from a moral, social, domestic, or merely personal relationship where one person trusts and relies upon another." *Gray v. Sangrey*, 428 S.W.3d 311, 316 (Tex. App.—Texarkana 2014, pet. denied) (citing *Crim Truck & Tractor v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992)); *Smith v. Deneve*, 285 S.W.3d 904, 911 (Tex. App.—Dallas 2009, no pet.). However, we have previously stated, "There exists no fiduciary or agency relationship between cotenants, or tenants in common, in the absence of an agreement or contract providing for such." *In re Marriage of Notash*, 118 S.W.3d 868, 872 (Tex. App.—Texarkana 2003, no pet.) (quoting *Donnan v. Atl. Richfield*, 732 S.W.2d 715, 717 (Tex. App.—Corpus Christi 1987, writ denied)); *see Glover v. Union Pac. R.R. Co.*, 187 S.W.3d 201, 218 (Tex. App.—Texarkana 2006, pet. denied) ("Absent an agreement to the contrary, a cotenant has no fiduciary obligation to the other cotenants.... A failure to disclose is fraud only when there is a duty to disclose." (citations omitted)); *Scott v. Scruggs*, 836 S.W.2d 278, 282 (Tex. App.—Texarkana 1992, writ denied).

27. Unjust enrichment occurs "when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *BP Auto. LP v. RML Waxahachie Dodge, LLC*, No. 06-16-00021-CV, 517 S.W.3d 186, 207 (Tex. App.—Texarkana 2017, no pet.) (quoting *Protocol Tecs., Inc. v. J.B. Grand Canyon Dairy, L.P.*, 406 S.W.3d 609, 614 (Tex. App.—Eastland 2013, no pet.)).

28. The discovery rule is "a very limited exception to statutes of limitations" that "defers the accrual of the cause of action until the injury was or could have reasonably been discovered." *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 929–30 (Tex. 2011). "The discovery rule applies 'only when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable.'" *Id.* (quoting *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734 (Tex. 2001)). The Texas Supreme Court has "restricted the discovery rule to exceptional cases to avoid defeating the purposes behind the limitations statutes." *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006) (per curiam).

29. Harleton also argued, mistakenly, that the four-year statute of limitations should apply to its unjust enrichment claims because they were based on contractual breaches.

dismissed the state court suit and the limitations period had expired before the federal suit was filed; (2) the discovery rule did not apply; (3) Harleton had the burden of proving fraudulent concealment to apply a tolling provision; and (4) equitable tolling did not apply since Harleton could have simply abated its first state court suit until the resolution of the federal litigation. Although the Freeman Defendants did not reply to all of the specific limitations arguments in Harleton's brief, it filed a motion for new trial arguing that the trial court erred in failing to grant their summary judgment on limitations grounds.

We conclude that the issue of whether Harleton's unjust enrichment claims were barred by the statute of limitations was squarely before the trial court. Finding the limitations issue preserved, we address it on the merits.

### C. Limitations Barred Harleton's Unjust Enrichment Claims

■ "The Texas Supreme Court has held that the two-year statute of limitations applies to unjust enrichment" claims. *Sherer*, 393 S.W.3d at 491–92 (citing *Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 871 (Tex. 2007) (per curiam)); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 (West 2017). "The statute of limitations … period start[s] to run when the unjust enrichment cause of action accrued." *Sherer*, 393 S.W.3d at 491.

■ ·The Buffco and Freeman Defendants argue that the trial court erred in failing to grant their summary judgment motion on limitations grounds. Specifically, the Buffco Defendants argue that any claim for unjust enrichment would have accrued during the September 2008 closing when Chesapeake paid for the Chesapeake Assignments and that Harleton was required to make a claim for unjust enrichment before September 2010. Citing to

Wooldrige's testimony and affidavits, Harleton argues that it first became aware of the unjust enrichment claim in January or February 2009. For purposes of this analysis, we give Harleton the benefit of the doubt and assume, without deciding, that limitations began to run, at the latest, in February 2009. Thus, in order to be entitled to the benefit of the tolling provision in Section 16.064 of the Texas Civil Practice and Remedies Code, Harleton was required to raise a claim for unjust enrichment by, at the latest, February 2011. ·

Harleton does not argue that its first petition filed in state court in 2009 contained any reference to unjust enrichment. Instead, it relies on its federal court filings. Harleton filed its complaint in intervention on October 12, 2010. Its amended complaint in intervention was filed on March 14, 2011, over two years after the alleged discovery of the Chesapeake transaction by Harleton in February 2009. With this in mind, we ask whether Harleton's federal complaints put the Buffco and Freeman Defendants on notice that it was asserting unjust enrichment claims against them prior to the end of February 2011.

■ The Federal Rules of Civil Procedure require a party to make "a short and plain statement of the claim showing that the pleader is entitled to relief," setting out its claims in numbered paragraphs. FED. R. CIV. P. 8(a)(2), 10(b). Under the Federal Rules of Civil Procedure, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

The factual portion ·of Harleton's original and amended complaints in intervention contained the following statements: (1)

"Harleton has learned and will show that the Defendants were paid the sum of $20,000.00 per acre for the deep rights under the Geisler Unit."; (2) "Because Harleton was not informed of [the Chesapeake transaction,] the Defendants were allowed to pocket the money that rightfully should have been paid to [Harleton]."; and (3) "Defendants had already closed and received $20,000.00 an acre for a 100% working interest." The claims against Chesapeake and the Buffco and Freeman Defendants were set forth in separate numbered paragraphs, but asserted only claims for breach of contract, tortious interference with business relations, fraud, and fraudulent inducement. The remedy sought in both complaints was specific performance of the Letter Agreement by "forcing Chesapeake to buy their 50% working interest," not the imposition of a constructive trust or disgorgement of the money paid to the Buffco or Freeman Defendants.

We have thoroughly reviewed Harleton's federal complaints. Applying the Federal Rules of Civil Procedure, we conclude that a liberal reading of these complaints leads us to the conclusion that Harleton failed to raise an unjust enrichment claim against the Buffco and Freeman Defendants in federal court.

 Our ruling on this matter would not be different even if we were to apply the Texas pleading standards to Harleton's complaints in federal court. "Texas follows a 'fair notice' standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000). In Texas, "[a] petition must state, in plain and concise language, the causes of action asserted and must give the defendant 'fair

notice,' when the plaintiff's allegations are considered as a whole." *Irwin v. Salem*, Nos. 03-10-00508-CV & 03-10-00509-CV, 2011 WL 3890406, at *3 (Tex. App.—Austin Aug. 31, 2011, no pet.) (mem. op.) (citing Tex. R. Civ. P. 45(b)); *see* Tex. R. Civ. P. 47(a). "In determining whether a petition sufficiently pleads a [claim], we view the petition from the defendant's perspective and ask whether the defendant was given fair notice of the claim." *Salem*, 2011 WL 3890406, at *3 (citing *Wilson v. Bloys*, 169 S.W.3d 364, 369 (Tex. App.—Austin 2005, pet. denied)); *see Benavides v. Cushman, Inc.*, 189 S.W.3d 875, 881–82 (Tex. App.—Houston [1st Dist.] 2006, no pet.). The question is whether the claim "may be reasonably inferred from what is specifically stated." *In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015) (orig. proceeding) (quoting *Boyles v. Kerr*, 855 S.W.2d 593, 601 (Tex. 1993)). "When ... no special exceptions are filed, we construe pleadings liberally in favor of the pleader." *Bundren v. Holly Oaks Townhomes Ass'n, Inc.*, 347 S.W.3d 421, 431 (Tex. App.—Dallas 2011, pet. denied).

 Even applying the fair notice standard and liberally construing Harleton's federal complaints, a claim for unjust enrichment cannot be read from them. Although the factual portion of the complaint mentioned that "[d]efendants were allowed to pocket the money that rightfully should have been paid to [Harleton]" and contained other similar references, a "passing reference" in the factual portion of a pleading does not equate to fair notice. *Irwin*, 2011 WL 3890406, at *3 (holding that Defendants did not have fair notice of an unjust enrichment claim even though the petition mentioned the term "unjust enrichment"). This is especially so because other claims asserted by Harleton in the federal litigation required proof of damages, explaining the need to include

references to the Buffco and Freeman Defendants' retention of money paid by Chesapeake. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224–26 (Tex. 2017).

Moreover, "when determining whether a cause of action has been pleaded, we must be able to determine from the pleadings alone the elements of the cause of action." *Wilson v. Bloys*, 169 S.W.3d 364, 369 (Tex. App.—Austin 2005, pet. denied); *see Quality Hardwoods, Inc. v. Midwest Hardwood Corp.*, No. 2-05-311-CV, 2007 WL 1879797, at *5 (Tex. App.—Fort Worth June 28, 2007, no pet.) (mem. op.); *Benavides*, 189 S.W.3d at 882. "A plaintiff may recover under unjust enrichment " 'when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.' " " *BP Auto. LP v. RML Waxahachie Dodge, LLC*, 517 S.W.3d 186, 207 (Tex. App.—Texarkana 2017, no pet.) (quoting *Protocol Techs., Inc.*, 406 S.W.3d at 614) (quoting *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)).[30] While Harleton's complaints set out the facts of the Chesapeake transaction, they do not specify that the Buffco and Freeman Defendants obtained a benefit from Harleton (as opposed to Chesapeake).

Although Harleton filed this suit in 2012, it included unjust enrichment as a specific claim for the first time on March 23, 2015, when it amended its petition in this case. Because we find that Harleton's unjust enrichment claim was untimely raised, we conclude that the Buffco and Freeman Defendants conclusively established their entitlement to summary judgment on the limitations issue. We sustain their points of error (1) complaining of the trial court's failure to grant summary judgment on this issue and (2) arguing that the imposition of a constructive trust was improper.[31]

Additionally, because unjust enrichment was the only cause of action in Harleton's petitions against the Buffco and Freeman Defendants which remained after the trial court (1) dismissed the negligent misrepresentation claim against the Freeman Defendants, (2) dismissed Harleton's claims

---

30. Unjust enrichment is "based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) (orig. proceeding). We have also written:

> We acknowledge that there are some exceptional cases where a constructive trust is imposed in favor of the plaintiff even though the defendant's enrichment was *not* at the expense of the plaintiff. *See Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509 (1942). These cases involve the situation where a person in a fiduciary relationship "acquires property, and the *acquisition or retention of the property is in violation of his duty as fiduciary*." RESTATEMENT OF RESTITUTION § 190 (1937) (emphasis added). *See generally Kinzbach Tool Co.*, 160 S.W.2d at 509; RESTATEMENT OF RESTITUTION Ch. 12 (1937).

*Intermarque Auto. Prods., Inc. v. Feldman*, 21 S.W.3d 544, 552 (Tex. App.—Texarkana 2000, no pet.). This is not such an exceptional case.

31. In its appellee's brief, Harleton argued that the trial court could impose a constructive trust on the Buffco and Freeman Defendants due to their breach of the ROFR. The Buffco and Freeman Defendants argue that Harleton has waived this issue. We agree.

An appellant's opening brief "must state concisely all issues or points presented for review." TEX. R. APP. P. 38.1(f). Issues not clearly stated and argued in an opening brief by an appellant are waived. *See In re Estate of Taylor*, 305 S.W.3d 829, 836–37 (Tex. App.—Texarkana 2010, no pet.). The trial court granted summary judgment against Harleton on the breach of ROFR, and Harleton did not appeal the issue. Harleton cannot revive the issue by raising it in an appellee's brief. *See Phillips Dev. & Realty, LLC v. LJA Eng'g, Inc.*, 499 S.W.3d 78, 89 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

for breach of the ROFR against both the Buffco and Freeman Defendants, and (3) severed the fraud and misrepresentation claims against the Buffco Defendants, we must reverse the trial court's judgment against the Buffco and Freeman Defendants and render judgment that Harleton take nothing by its claims against them.

## IV. Chesapeake Cannot Recover Sums for Any "Overpayment" Under the Letter Agreement from Freeman Because Freeman Was Not Overpaid

Next, we address Chesapeake's appeal from the trial court's judgment.

### A. Chesapeake Seeks the Return of $408,000.00

Of the $6,800,000.00 that Chesapeake paid to the Freeman Defendants, the trial court ordered $3,400,000.00 held in constructive trust for Harleton's benefit. Chesapeake does not advance any point of error with respect to that portion of the trial court's ruling. Instead, it only challenges the trial court's decision to allow the Freeman Defendants to retain the $408,000.00 that Chesapeake paid for Capital's interest.

Chesapeake relies on the federal court proceedings and Gilstrap's ruling in support of its position. In the federal litigation, Chesapeake asserted claims against Capital, although they were later abandoned. In response to those federal claims, Capital asserted a claim against Chesapeake to recover $408,000.00 for the sale of its interest in the Geisler Unit (even though the Freeman Defendants could not have sold Capital's interest since it could not convey more than it owned). *See Chesapeake Louisiana, L.P. v. Buffco Prod., Inc.*, 564 Fed.Appx. 751, 753 (5th Cir. 2014) (per curiam). Gilstrap's ruling had afforded Capital the same relief achieved by Harleton in the second state court liti-

gation. Because the trial court's ruling in this case did not account for Capital, which filed no counter-claims here, Chesapeake argues that it paid money to the Freeman Defendants for a 3% interest in the Geisler Unit which it never received. In support of its argument that the trial court erred in failing to grant summary judgment in Chesapeake's favor on this point, Chesapeake attached the following representation in the Freeman Defendants' Motion for Summary Judgment against the Chesapeake Defendants in the federal litigation:

Chesapeake's equitable claim for money had and received fails as a matter of law for the same reason as do its other equitable claims—that is, the Freeman Defendants are not holding money that in equity belongs to Chesapeake. Instead, the Freeman Defendants are holding money that was properly paid to them by Chesapeake under the terms of the Letter Agreement. Simply put, Chesapeake, admittedly, conclusively waived the Title Defect associated with the Geisler [Unit] by failing to timely and properly give notice of the Title Defect and was thereafter barred from reducing the allocated value of the Geisler [Unit]. Accordingly, the money held by the Freeman Defendants, rightly belongs to them, with the limited exception of the $408,000 that the Freeman Defendants are withholding as an off-set against monies owed to the Freeman Defendants under the Letter Agreement.

Chesapeake argues that the Freeman Defendants previously admitted that they were merely holding the $408,000.00 as a set-off, that they acknowledged that they had no entitlement to the funds, and that they should now be precluded from arguing that they do.

### B. Summary of the Argument

■ Chesapeake's argument that it is entitled to recover the "overpayment" rests on an unjust enrichment theory. It points to testimony from Stallings and Denny, as well as the emails between Parkins and Wolcott, to support its argument that it paid for a 100% interest in the Geisler Unit and that the Freeman Defendants' failure to assign a 50% interest in the Geisler Unit led to an overpayment. The Freeman Defendants respond [32] by arguing that they are entitled to the money because Chesapeake failed to give notice of a title defect and, pursuant to the terms of the Letter Agreement, conclusively waived any such defects and accepted the assignment. Accordingly, the Freeman Defendants argue that Chesapeake was contractually obligated to pay the full purchase price and that retention of the funds cannot be unjust.[33] Simply put, the Freeman Defendants suggest that the unjust enrichment claims are barred by the existence of the Letter Agreement.

In response to the Freeman Defendants' argument that the Letter Agreement bars an unjust enrichment claim, Chesapeake first argues that, like Harleton, the Freeman Defendants were not a signatory to the Letter Agreement, and, therefore, the Letter Agreement does not expressly govern the question of the overpayment for this reason.[34] Alternatively, Chesapeake states, "Texas courts do allow a party to recover, under a theory of unjust enrichment, an overpayment that was made as a part of the performance of a contract."

**C. The Letter Agreement Governs this Dispute**

■ Chesapeake's unjust enrichment theory argues that recovery of the $408,000.00 is rooted in quasi-contract. "A contract implied in law, or a quasi-contract, is distinguishable from a true contract because a quasi-contract is a legal fiction, an obligation imposed by law regardless of any actual agreement between the parties." *Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 900 (Tex. App.—Dallas 2006, no pet.) (citing *Fraud–Tech, Inc. v. Choicepoint, Inc.*, 102 S.W.3d 366, 368 (Tex. App.—Fort Worth 2003, pet. ref'd)). "This equitable doctrine allows for the recovery of damages to prevent a party from obtaining a benefit from another by fraud, duress, unjust enrichment, or because of an undue advantage." *Id.* (citing *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000); *Heldenfels Bros., Inc.*, 832

**32.** The Freeman Defendants also questioned whether this issue was preserved for our review. They pointed out that the trial court denied Chesapeake's breach of contract claim against the Freeman Defendants and that Chesapeake has not appealed that ruling and argued that Chesapeake cannot now seek to recover damages for breach of contract under an unjust enrichment theory. However, because the trial court's summary judgment ruling further granted Freeman's motion for summary judgment to the extent that it "seeks a dismissal of Chesapeake's claims for a 'refund' from Freeman," we find that Chesapeake has preserved its point of error for our review.

**33.** The Freeman Defendants also bolster their argument by pointing to emails between Stallings, Denny, and others, which allegedly demonstrate that Chesapeake knew of Harleton's interest in the Geisler Unit.

**34.** Chesapeake also argues that the Freeman Defendants gave a warranty, not a quitclaim, deed. However, the trial court denied Chesapeake's motion for summary judgment on its claim of breach of warranty, and Chesapeake did not appeal this portion of the trial court's ruling in its opening brief. Moreover, as the Freeman Defendants argue, the Chesapeake assignment conveyed not a specific interest in the Geisler Unit, but whatever right, title, and interest Freeman Resources had in the Geisler Unit. The language used in the conveyance is classic special warranty wording, limiting the warranty only to those claiming under the grantor.

S.W.2d at 41). "Unjust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay." *Id.*

However, unjust enrichment claims based on quasi-contract are predicated on the absence of an express contract controlling the circumstances. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683 (Tex. 2000); *Burlington N. R.R. Co. v. Sw. Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996), *aff'd*, 966 S.W.2d 467 (Tex. 1998).

> The Texas Supreme Court has written: Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory, *see generally TransAmerican Natural Gas Corp. v. Finkelstein*, 933 S.W.2d 591, 600 (Tex. App.—San Antonio 1996, writ denied), with certain exceptions not relevant here, *see, e.g., Southwestern Electric Power Co. v. Burlington Northern Railroad Co.*, 966 S.W.2d 467, 469–70 (Tex. 1998) (observing that overpayments under a contract can be recovered under a theory of restitution or unjust enrichment). That is because parties should be bound by their express agreements. When a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement. *See TransAm. Natural Gas Corp.*, 933 S.W.2d at 600.

*Fortune Prod. Co.*, 52 S.W.3d at 684.

"Texas's strong public policy favoring freedom of contract is firmly embedded in our jurisprudence." *Philadelphia Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016). "Absent compelling reasons, courts must respect and enforce the terms of a contract the parties have freely and voluntarily entered." *Id.* "[T]he doctrine of unjust enrichment does not apply when the contractual duty at issue has been performed." *Burlington N. R.R. Co.*, 925 S.W.2d at 97. This is due to the fact that "unjust enrichment is not a proper remedy merely because it 'might appear expedient or generally fair that some recompense be afforded for an unfortunate loss' to the claimant, or because the benefits to the party sought to be charged amount to a windfall." *First Union Nat'l Bank v. Richmont Capital Partners, L.P.*, 168 S.W.3d 917, 931 (Tex. App.—Dallas 2005, no pet.) (quoting *Heldenfels Bros., Inc.*, 832 S.W.2d at 42). In other words, "[t]he doctrine of unjust enrichment does not operate to rescue a party from the consequences of a bad bargain, and the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract." *Id.* (citing *Burlington N.*, 925 S.W.2d at 97).

Under the plain terms of the non-ops offer clause of the Letter Agreement, Chesapeake's offer to the Freeman Defendants was based on the same terms as Buffco/Twin's offer. The Freeman Defendants accepted this offer, and all parties performed accordingly. Therefore, we conclude that the Letter Agreement governs this dispute.

### D. Analysis

To determine whether Chesapeake is entitled to the $408,000.00, we must interpret the Letter Agreement to ascertain whether Chesapeake conclusively waived title defects. If so, it necessarily waived its rights to collect an overpayment by failing to notify the Freeman Defendants of any title defects.

"In construing a written contract, our primary concern is to ascertain the intentions of the parties as expressed in the instrument." *Petrohawk Props., L.P. v. Jones*, 455 S.W.3d 753, 764–65 (Tex. App.—Texarkana 2015, pet. dism'd) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005); *Craig Sessions, M.D., P.A. v. TH Healthcare, Ltd.*, 412 S.W.3d 738, 742 (Tex. App.—Texarkana 2013, no pet.)). "A contract term is given its plain and ordinary meaning unless the instrument indicates a different meaning is intended by the parties." *Id.* at 765 (citing *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009); *Craig Sessions, M.D., P.A.*, 412 S.W.3d at 742).

No party argues that the Letter Agreement is ambiguous.[35] "The construction of an unambiguous contract is a question of law which we review de novo." *Id.* (citing *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011)). "The parol evidence rule prohibits, in the absence of fraud, accident or mistake, the introduction into evidence of oral evidence for the purpose of varying, adding to or contradicting the terms of a valid written instrument that on its face is complete and unambiguous."[36] *Time Ins. Agency, Inc. v. Grimes*, 613 S.W.2d 40, 42 (Tex. Civ. App.—Texarkana 1981, no writ). Thus, "[w]hen the contract is unambiguous, 'the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls. Generally the parties to an instrument intend every clause to have some effect and in some measure to evidence their agreement.'" *Petrohawk Props., L.P.*, 455 S.W.3d at 765 (quoting *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968) (citations omitted)).

Under the terms of the Letter Agreement, Chesapeake promised to pay $232,146,680.00 for *"three-year term assignments* of all of Seller's right, title and interest in and to the lands described in" Exhibits A-1 through A-3 attached to the Letter Agreement, which covered many properties in four counties. In bold lettering, on the top of Exhibit A-2, the exhibit which included the Geisler Unit, was the following paragraph (the emphasis appears in the original):

**Seller does not represent that it owns the rights below the Cotton Valley formation in all of the lands and leases described below, and Chesapeake agrees that it will perform its own title due diligence subject to the provisions set forth in Exhibit B. Seller reserves the right to supplement this Exhibit in good faith with the intention of the parties being that Seller offer to convey all rights below 100 feet beneath the base of the Cotton Valley formation in the counties listed below.**

**35.** "A contract is not ambiguous simply because the parties disagree over its meaning." *Petrohawk Props., L.P.*, 455 S.W.3d at 765 (quoting *Apache Corp.*, 294 S.W.3d at 168). "Rather, only when 'its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation' is a contract deemed ambiguous." *Id.* (quoting *Craig Sessions, M.D., P.A.*, 412 S.W.3d at 743).

**36.** "[W]hen construing a contract, a court is 'to take the wording of the instrument, consider the same in the light of the surrounding circumstances, and apply the pertinent rules of construction thereto and thus settle the meaning of the contract.'" *Petrohawk Props., L.P.*, 455 S.W.3d at 765 (citing *City of Pinehurst*, 432 S.W.2d at 519). Yet, "although evidence of custom and trade usage may not be used to contradict an express term, it is 'admissible to explain, supplement, or qualify a term or an agreement.'" *Id.* at 774 (citing *Craig Sessions, M.D., P.A.*, 412 S.W.3d at 745–46).

Again, the non-ops offer clause stated, "Chesapeake also agrees to make this offer to any non-operating working interest owners in the Properties ("Non-Ops") under the same terms and net acre price as stated in this offer. This offer is subject to Chesapeake's due diligence as described in Exhibit B."

Exhibit B obligated Seller to "make available . . . all existing Lease, title, contract, and legal files related to the Properties," and "Chesapeake [would] review title to the Properties prior to Closing and notify Seller in writing of any Title Defect it discover[ed] as soon as reasonably practicable." The term "Title Defect" included "any matter that reduce[d] the net revenue interest to be conveyed to Chesapeake." A notice of title defect would include "the amount by which Chesapeake believe[d] the value of the Leases ha[d] been reduced because of the Title Defect." If it failed "to notify Seller in writing within the applicable period," the Letter Agreement provided that "Chesapeake [would] be deemed to have conclusively waived any Title Defect." If Chesapeake did not waive the Title Defect, the purchase price of the Letter Agreement would "be reduced by the amount of the Title Defect, not to exceed the Allocated Value of the affected portion of the Properties." The term "Allocated Value" meant "$20,000.00 per net acre" in the counties involved.

We first note that nothing in the Letter Agreement established that Chesapeake contracted to purchase 100% of the deep rights in the Geisler Unit. The Letter Agreement provided, "Seller does not represent that it owns the rights . . . in all of the lands and leases." Given the due diligence provisions, our reading of the Letter Agreement leads us to conclude that Chesapeake was purchasing whatever interests

the sellers had in the Geisler Unit. The $232,146,680.00 figure was listed as the "Purchase Price" of the Letter Agreement. The only mention of $20,000.00 per acre was in the "Allocated Value" of the due diligence provision, which provided for a reduction of the purchase price if Chesapeake's due diligence uncovered title defects. When Chesapeake failed to notify the Freeman Defendants of any title defects, it conclusively waived them and paid Freeman $6,800,000.00 in exchange for an assignment of whatever interests the Freeman Defendants had in the Geisler Unit.

 It is true "that in some circumstances, overpayments under a valid contact may give rise to a claim for restitution or unjust enrichment." *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467, 469 (Tex. 1998). As we discussed in *Casstevens v. Smith*, courts allow recovery under unjust enrichment and restitution theories (1) "by a defrauded party against the party who committed the fraud," (2) "by a party that made an overpayment" through mistaken accounting, and (3) "by a party that paid or credited money to the wrong person or account." *Casstevens v. Smith*, 269 S.W.3d 222, 230 n.3 (Tex. App.—Texarkana 2008, pet. denied). Conversely, Texas courts have rejected recovery in cases where money was paid under a unilateral mistake,[37] while other courts have held that, as between two innocent parties, the party that must suffer the loss is the one that mistakenly created the situation and was in the best position to have avoided it. *Id.* Where a party to a contract assumes the risk and undertakes due diligence, the contract governs.

Here, we conclude that Chesapeake assumed the risk to undertake due diligence

---

**37.** "[M]oney paid under a unilateral mistake cannot be recovered." *Sellman v. Am. Nat'l* *Ins. Co.*, 281 S.W.2d 150, 154 (Tex. Civ. App.—Texarkana 1955, writ dism'd).

and that the only mechanism to reduce the purchase price was through notification of a title defect. Simply put, Chesapeake cannot recover sums validly paid under the Letter Agreement by arguing that it can usurp the due diligence provisions through an assertion of unjust enrichment.[38] Accordingly, we affirm the trial court's decision to allow the Freeman Defendants to retain all sums paid to them by Chesapeake.

**38.** In support of this conclusion, we look to *El Paso Field Services, L.P. v. MasTec North America, Inc.*, 389 S.W.3d 802 (Tex. 2012). In that case, El Paso Field Services, L.P. (El Paso) purchased a pipeline that turned out to be too shallow to be safe. *Id.* at 803. It decided to remove the old pipe and replace it and invited companies to submit bids for the work. *Id.* Before inviting the bids, however, El Paso hired a survey map company to survey the pipeline route. *Id.* The survey revealed 280 foreign crossings along the pipeline's way. *Id.* at 803–04. MasTec, who had never built a pipeline, asked Bill White, a man with forty-one years of experience in pipeline construction, to review the survey map company's survey. Based partly on the representation that there were 280 foreign crossings, White recommended that MasTec bid on the project, and MasTech won the bid. *Id.* It later discovered that there were 794 foreign crossings, and it sued El Paso for breach of contract. *Id.* at 805. El Paso responded that under their contract, MasTec had assumed the risk on the project. *Id.* The Texas Supreme Court agreed. While the contractual language in that case distinguishes it from the unique fact situation presented in this case, *El Paso* supports the theory that a party under a contract that specifically assumes the risk may not recover under unjust enrichment, even though the other party supplied it with incorrect information.

This is further illustrated by the following segment in the Restatement of Contracts:

§ 154. *When a Party Bears the Risk of a Mistake*

A party bears the risk of a mistake when
(a) the risk is allocated to him by agreement of the parties, or
(b) he is aware, at the time the contract is made, that he has only limited knowledge

## V. Harleton Is not Entitled to Attorney Fees for Chesapeake's Breach of a Contract Because it Is not a Third-party Beneficiary Entitled to Enforce the Letter Agreement

▐ Harleton asserts a single issue on appeal. It argues that the trial court erred in failing to order Chesapeake to pay Harleton's attorney fees after it established that Chesapeake breached a contract with Harleton. Chesapeake argues

with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

. . . .

[cmt.] *b. Allocation by agreement.* The most obvious case of allocation of the risk of a mistake is one in which the parties themselves provide for it by their agreement. Just as a party may agree to perform in spite of impracticability or frustration that would otherwise justify his non-performance, he may also agree, by appropriate language or other manifestations, to perform in spite of mistake that would otherwise justify his avoidance. An insurer, for example, may expressly undertake the risk of loss of property covered as of a date already past. Whether the agreement places the risk on the mistaken party is a question to be answered under the rules generally applicable to the scope of contractual obligations, including those on interpretation, usage and unconscionability. See Chapter 9.

● **Illustration:**
1. A contracts to sell and B to buy a tract of land. A and B both believe that A has good title, but neither has made a title search. The contract provides that A will convey only such title as he has, and A makes no representation with respect to title. In fact, A's title is defective. The contract is not voidable by B, because the risk of the mistake is allocated to B by agreement of the parties.

RESTATEMENT (SECOND) OF CONTRACTS § 154 (West, Westlaw through June 2017).

that Harleton was not a party to the Letter Agreement and that it cannot recover attorney fees for breach of the Letter Agreement.[39] We concur with Chesapeake's position.

 "Texas follows the American Rule, which provides that litigants may recover attorney's fees only if specifically provided for by statute or contract." *Fleming & Assocs., L.L.P. v. Barton*, 425 S.W.3d 560, 574 (Tex. App.—Houston [14th Dist.] 2014, pets. denied) (citing *Epps v. Fowler*, 351 S.W.3d 862, 865 (Tex. 2011)). Here, the parties agree that the only possible authority for recovery of attorney fees in this case is Section 38.001(8) of the Texas Civil Practice and Remedies Code (the TCPRC), which provides that a "person" may recover attorney fees from "an individual or corporation" for a claim under an oral or written contract. *See* TEX. CIV. PRAC. & REM. CODE. ANN. § 38.001(8) (West 2015).

 It is undisputed that Harleton was not a party to the Letter Agreement between Chesapeake and Buffco/Twin. Thus, Harleton must show that it was a third-party beneficiary to the Letter Agreement in order to recover attorney fees. "To qualify as one for whose benefit the contract was made, the third party must show that he is either a donee or creditor beneficiary of, and not one who is benefited only incidentally by the performance of, the contract." *MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999) (citing 1 WILLISTON ON CONTRACTS § 356; 4 CORBIN ON CONTRACTS § 779C (1951); *see also* RESTATEMENT (SECOND) OF THE LAW OF CONTRACTS § 302). "One is a donee beneficiary if the performance promised will, when rendered, come to him as a pure donation." [40] *Id.* (citing 1 WILLISTON ON CONTRACTS § 356; 4 CORBIN ON CONTRACTS § 774). "If ... that performance will come to him in satisfaction of a legal duty owed to him by the promisee, he is a creditor beneficiary." *Id.* (citing 1 WILLISTON ON CONTRACTS § 356; 4 CORBIN ON CONTRACTS § 774).

 On the other hand, "[i]ncidental benefits that may flow from a contract to a third party do not confer the right to enforce the contract." *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 421 (Tex. 2011) (quoting *S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 306 (Tex. 2007) (per curiam)); *see Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011). "A third party may only enforce a contract when the contracting parties themselves intend

---

**39.** Alternatively, Chesapeake argued that Section 38.001 prevented Harleton from recovering attorney fees from Chesapeake because it is a limited partnership. In *Fleming*, our sister court concluded that attorney fees under Section 38.001 could not be assessed against a limited liability partnership because it was not a "person or corporation." *Fleming*, 425 S.W.3d at 575. Since *Fleming*, a few of our sister courts have also concluded that the plain language of Section 38.001 does not permit recovery of attorney fees from limited partnerships. *Varel Int'l Indus., L.P. v. Petro-Drillbits Int'l, Inc.*, No. 05-14-01556-CV, 2016 WL 4535779, at *8 (Tex. App.—Dallas Aug. 30, 2016, pet. denied) (mem. op.); *Choice! Power, L.P. v. Feeley*, 501 S.W.3d 199, 214 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *EXCO Operating Co. v. McGee*, No. 12-15-

00087-CV, 2016 WL 4379484, at *2 (Tex. App.—Tyler Aug. 17, 2016, no pet.) (mem. op.). Our court has not previously decided this issue. We do note, however, that the Texas Legislature is currently considering amending Section 38.001 to include recovery of attorney fees by limited partnerships. *See* Tex. H.B. 744, 85th Leg., R.S. (2017), http://www.capitol.state.tx.us/tlodocs/85R/billtext/pdf/HB00744E.pdf#navpanes=0.

**40.** Harleton is not a donee beneficiary because the performance promised by Chesapeake was not a pure donation, but was made in exchange for an assignment of working interests in the Geisler Unit. *See Maddox*, 361 S.W.3d at 759.

to secure some benefit for the third party and entered into the contract directly for the third party's benefit." *Sharyland Water Supply Corp.*, 354 S.W.3d at 421 (quoting *Lomas*, 223 S.W.3d at 306); *see MCI Telecomms. Corp.*, 995 S.W.2d at 651. "Importantly, the fact that a person is directly affected by the parties' conduct, or that he may have a substantial interest in a contract's enforcement, does not make him a third-party beneficiary." *Sharyland Water Supply Corp.*, 354 S.W.3d at 421 (internal quotation marks omitted) (quoting *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1075 (5th Cir. 2002)); *see Maddox v. Vantage Energy, LLC*, 361 S.W.3d 752, 757 (Tex. App.—Fort Worth 2012, pet. denied). It is also "not enough that the ... parties knew that the third party would benefit." *First Bank v. Brumitt*, No. 15-0844, 519 S.W.3d 95, 102, 2017 WL 1968830, at *3 (Tex. May 12, 2017).

> Unless Harleton can classify as a ... true creditor-beneficiary (undertaking to discharge or protect bargain-seeker's obligation), third-party beneficiary recovery, subject to narrow exceptions, will be denied (1) unless the obligation of bargain-giver be fully spelled out, (2) unless it be unmistakable that a benefit to the third party was within contemplation of the primary contracting parties, and also (3) unless the primary parties contemplated that the third party would be vested with the right to sue for enforcement of the contract—all presumptions being invoked against liability to the third party.

*MJR Corp. v. B & B Vending Co.*, 760 S.W.2d 4, 15 (Tex. App.—Dallas 1988, writ denied); *see* 13 WILLISTON ON CONTRACTS § 37:19 (4th ed.).

■ "In determining whether a third party can enforce a contract, the intention of the contracting parties is controlling." *Carson Energy, Inc. v. Riverway Bank*, 100 S.W.3d 591, 600 (Tex. App.—Texarkana 2003, pet. denied) (citing *MCI Telecomm. Corp.*, 995 S.W.2d at 651). "The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out, or enforcement by the third party must be denied." *Id.* (citing *MCI Telecomm. Corp.*, 995 S.W.2d at 651). "Consequently, a presumption exists that parties contracted for themselves unless it 'clearly appears' that they intended a third party to benefit from the contract." *Id.* (quoting *MCI Telecomm. Corp.*, 995 S.W.2d at 651) (denying third-party beneficiary status where the contract specifically stated it was not intended to benefit nonsignatories). In making this determination, "courts must look solely to the contract's language, construed as a whole." *First Bank*, 519 S.W.3d at 102, 2017 WL 1968830, at *4. Therefore, to determine if Harleton can enforce the Letter Agreement, (1) we begin by noting that "there is a presumption against conferring third-party-beneficiary status on noncontracting parties," and (2) we must interpret the agreement. *S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 306 (Tex. 2007) (per curiam); *see Tawes*, 340 S.W.3d at 425.

■ "The construction of an unambiguous contract is a question of law for the court, which we may consider under a de novo standard of review." *Tawes*, 340 S.W.3d at 425 (citing *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009) (per curiam)). "When discerning the contracting parties' intent, courts must examine the entire agreement and give effect to each provision so that none is rendered meaningless." *Id.* (citing *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006)). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instru-

ment." *Id.* (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). "All doubts must be resolved against conferring third-party beneficiary status." *Id.* (citing *MCI*, 995 S.W.2d at 652).[41]

It is true that "[a] third-party beneficiary need not be identified by name but may instead be identified as a class or category of persons, all of whom need not be known to the contracting parties at the time the agreement is signed." *Soyars v. Rothchild Family P'ship #2, Ltd.*, No. 14-15-00461-CV, 2016 WL 4211613, at *2 (Tex. App.—Houston [14th Dist.] Aug. 9, 2016, no pet.) (mem. op.) (citing *Conoco-Phillips Co. v. Graham*, No. 01-11-00503-CV, 2012 WL 1059084, at *6 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, no pet.) (mem. op.)). However, "[t]o qualify as a creditor beneficiary, the maker of the contract (here, [Chesapeake]) must not only have intended to confer a benefit upon the third party ([Harleton]), but it also must have intended for the third-party to have the right to enforce the agreement." *In re Bayer Materialscience, LLC*, 265 S.W.3d 452, 457 (Tex. App.—Houston [1st Dist.] 2007, orig. proceeding) (citing *MJR Corp.*, 760 S.W.2d at 16); *see Tawes*, 340 S.W.3d at 428. "Unless the agreement expresses both intents, the third party remains no more than an incidental beneficiary." *Bayer Materialscience, LLC*, 265 S.W.3d at 457. The Texas Supreme Court has recently clarified, "To create a third-party beneficiary, the contracting parties must have intended to grant the third party the right to be a 'claimant' in the event of a breach." *First Bank*, 519 S.W.3d at 102, 2017 WL 1968830, at *3. "The right of [a third party] to enforce the contract . . . 'should not rest on implication,' but should be clearly apparent, and any doubt should be resolved against such intent." *Dorsett Bros. Concrete Supply, Inc. v. Safeco Title Ins. Co.*, 880 S.W.2d 417, 421 (Tex. App.—Houston [14th Dist.] 1993, writ withdrawn) (quoting *Knight Constr. Co. v. Barnett Mortg. Trust*, 572 S.W.2d 381, 382–83 (Tex. Civ. App.—Houston [14th Dist.] 1978, writ ref'd n.r.e.) (citation omitted)).

Here, we find no indication from the Letter Agreement that either Chesapeake or Buffco/Twin granted to Harleton the right to enforce the Letter Agreement. Chesapeake's obligation is spelled out in the non-ops offer clause, which contains two sentences. The first sentence is "Chesapeake also agrees to make this offer to any non-operat[ing] working interest owners in the Properties . . . under the same terms and net acre price as stated in this offer."[42] The second sentence of the non-

---

41. The Dallas Court of Appeals has aptly written:

There are many reported cases involving the claim of a right to recover as a third-party beneficiary. Each must be studiously analyzed for factual similarity or dissimilarity. This is an area where rules are comparatively simple to state but difficult to apply. Most of the cases prior to *Republic [Nat'l Bank v. Nat'l Bankers Life Ins. Co.*, 427 S.W.2d 76 (Tex.Civ.App.—Dallas 1968)]*, and some which are subsequent, do not discuss the three-part donee-creditor-incidental beneficiary test which appears to have originated in the RESTATEMENT (SECOND) OF CONTRACTS § 302 (1979). Where the case indicates a family relationship between bar-

gain-seeker and the third party, or the circumstances otherwise indicate that bargain-seeker possessed philanthropic orientation with regard to the third party, recovery has generally been allowed. Where the bargain-giver has promised a performance which will discharge or protect an obligation running from bargain-seeker to the third party, recovery has generally been allowed. On the other hand, *where neither of these conditions have existed, the bulk of the cases have denied recovery.*

*MJR Corp. v. B & B Vending Co.*, 760 S.W.2d 4, 13 (Tex. App.—Dallas 1988, writ denied).

42. An offer lapses if not accepted within a "reasonable time," whatever that might be. *See A.G.E., Inc. v. Buford*, 105 S.W.3d 667,

ops provision states, "This offer is subject to Chesapeake's due diligence as described in Exhibit B." When read as a whole, the Letter Agreement only obligated Chesapeake to make an offer to non-ops that it was aware of.[43] Accordingly, it does not reason that Chesapeake clearly intended to confer on Harleton the right to enforce the Letter Agreement in a manner that forced it to make an offer to non-ops who were not revealed during the due diligence process, where the offer was specifically "subject to" due diligence.[44] *See Burke v. Union Pac. Res. Co.*, 138 S.W.3d 46, 65 (Tex. App.—Texarkana 2004, pets. denied).

Accordingly, we conclude that Harleton was not a third-party beneficiary to the Letter Agreement. Thus, it could not be entitled to attorney fees for Chesapeake's breach of the Letter Agreement. Our rul-

ing on this matter also leads to the conclusion that Harleton did not have standing to enforce the Letter Agreement. We discuss the critical consequences of our finding in the subsequent section.

## VI. Because Harleton Did Not Have Standing to Bring Its Breach of Contract Claim Against Chesapeake, the Trial Court Was Without Subject Matter Jurisdiction Over the Claim

 "If the record presents a standing issue the parties have failed to raise, courts must do so sua sponte." *Fin. Comm'n of Tex. v. Norwood,* 418 S.W.3d 566, 591 (Tex. 2013). Where "the pleadings and record do not demonstrate an incurable jurisdictional defect, the case is remanded to the trial court where the plain-

673 (Tex. App.—Austin 2003, pet. denied). "A reasonable period of time is usually shorter in cases of contract for oil and gas leases than in the instance of conventional land transaction for the reason that values of leases fluctuate rapidly. Eugene Kuntz, *A Treatise on the Law of Oil & Gas*, § 19.10, vol. 2 (1989). Harleton first became aware of the Chesapeake transaction in November 2008. The terms of the July 31, 2008, Letter Agreement stated, "This offer will be considered void if not accepted by 5:00 PM CDT on August 1, 2008."

**43.** In other words, the offer to the non-ops was contingent on their identity being revealed. *See* Wendell H. Holmes, *The Freedom Not to Contract*, 60 Tul. L. Rev. 751, 783 n.113 (1986) (citing *In re Flagstaff Foodservice Corp.*, 25 B.R. 844 (Bankr. S.D.N.Y. 1982) (letter making offer to purchase, though arguably couched in sufficiently definite terms, was only offer to negotiate where conditioned on board approval, due diligence investigation, and execution of mutually acceptable purchase agreement)); Restatement (First) of Contracts § 265 (1932) ("A promise in terms conditional on the promisor's satisfaction with an agreed exchange, gives rise to no duty of immediate performance until such satisfaction."); *Oldcastle Materials, Inc. v. Rohlin*, 343 F.Supp.2d 762, 779 (N.D. Iowa 2004) ("the court finds that the 'due diligence' and other conditions do not create indefiniteness,

because they are, as a matter of law, precisely stated 'conditions precedent,' that is, they are 'facts and events occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available' ") (quoting *Gildea v. Kapenis*, 402 N.W.2d 457, 459 (Iowa Ct. App. 1987)).

**44.** Also, "[c]ontracts for the execution or assignment of an oil and gas lease require an offer and acceptance in accordance with established principles of contract law.... An invitation to negotiation is not an offer." Eugene Kuntz, *A Treatise on the Law of Oil & Gas*, § 19.2, vol. 2 (1989) "Before a contract is formed, there must be an acceptance of the offer. The offer ... may contemplate creating a bilateral contract and require acceptance by communication." *Id.* The Letter Agreement itself does not seem to be an offer. Instead, Chesapeake merely "agree[d] to make this offer." Harleton is attempting to enforce the promise to make an offer (as opposed to the entire Letter Agreement), (1) which was subject to due diligence, and (2) which lapsed if not accepted within a "reasonable time," whatever that might be. *See Buford*, 105 S.W.3d at 673.

tiff is entitled to a fair opportunity to develop the record relating to jurisdiction and to replead." *Id.* (citing *Westbrook v. Penley*, 231 S.W.3d 389, 395 (Tex. 2007)). However, where the jurisdictional defect cannot be cured, we must reverse and render.

"In Texas, 'standing' denotes the presence of a real controversy between the parties that will actually be determined by the judicial declaration sought." *Maddox*, 361 S.W.3d at 756 (citing *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005)). "Standing is a necessary component of subject-matter jurisdiction, without which a court lacks authority to hear a case." *Id.* (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444–45 (Tex. 1993)). "To establish standing to assert a breach of contract cause of action, a party must prove its privity to the agreement or that it is a third-party beneficiary" with the right to enforce the contract. *Id.*

We have previously determined that Harleton was neither a party to the Letter Agreement nor a third party-beneficiary to the Letter Agreement. Thus, it did not have standing to assert a breach of contract action against Chesapeake. Because this defect cannot be cured through repleading, we must reverse the trial court's judgment (even on the issuance of specific performance which Chesapeake did not appeal), and render judgment that Harleton take nothing on its breach of contract claim against Chesapeake.

## VII. No Individual Liability for Frank Bufkin, III

Considering the outcome which is precipitated by this opinion, it may appear a bit unnecessary to examine the liability of Frank Bufkin, III. However, we believe it helpful to address that point because it was the first one raised by the Buffco Defendants.

The Buffco Defendants argue that because the summary judgment evidence conclusively established that Bufkin executed the Letter Agreement only in his corporate capacity, Bufkin cannot be held personally liable for the trial court's judgment. They are correct.

"As a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts." *Pabich v. Kellar*, 71 S.W.3d 500, 507 (Tex. App.—Fort Worth 2002, pet. denied) (citing *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995)). "A corporation is a separate legal entity that normally insulates its owners or shareholders from personal liability." *Id.* (citing *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986), *superseded on other grounds by statute*, TEX. BUS. ORGS. CODE ANN. § 21.223 (West 2012); *In re Morris*, 12 S.W.3d 877, 885 (Tex. App.—Texarkana 2000, no pet.)). "The courts will not hold individual officers, directors, or stockholders liable on the obligations of a corporation except where it appears the individuals are using the corporate entity as a sham to perpetrate a fraud, avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations." *Id.* (citing *Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 339 (Tex. 1968)).

Bufkin signed the Letter Agreement with Chesapeake in a corporate capacity, and the terms of the Letter Agreement specified that the agreement was "by and between Chesapeake Louisiana, LP ... and Buffco Production Inc. and Twin Resources, LLC." [45] "The signa-

---

**45.** "It is well established that a shareholder is generally not liable for the obligations of a corporation. *See* TEX. BUS. ORGS. CODE ANN. § 21.223(a) (West 2012)." *Chan v. Sharpe*,

ture of a corporate officer on a contract does not render it his personal contract, where in the body of the contract, it is purported to be a corporation contract." *Star Supply Co. v. Jones*, 665 S.W.2d 194, 198 (Tex. App.—San Antonio 1984, no writ). Additionally, the fact that a person is a "sole shareholder and president of [a] corporation does not necessarily make him liable under the contracts he signs on its behalf or the injuries resulting to others as a result of those contracts." *Pabich*, 71 S.W.3d at 508.[46]

▮▮▮ Assuming that Bufkin breached the Letter Agreement, Harleton argues in its response, "Bufkin is liable for his complicity in the Bufkin entities' contractual breaches and unjust enrichment." [47] It cites no authority in support.[48] Harleton also contends that Bufkin should be held personally liable for a breach of the Letter Agreement because he "actively schemed to hide the deal [from] Harleton afterwards." On Harleton's motion, the trial court severed its claims of fraud and misrepresentation against the Buffco Defendants. Accordingly, we cannot address this argument because it involves the fraud and misrepresentation claims, which are still pending.

We conclude that the summary judgment evidence conclusively established that Bufkin signed the Letter Agreement as a corporate agent acting on behalf of the corporation. Therefore, Bufkin cannot be held individually liable for any damages awarded in the trial court's judgment.

## VIII. Conclusion

We reverse the trial court's judgment and render judgment that Harleton take nothing on its claims against Chesapeake and the Buffco and Freeman Defendants. In all other respects, we affirm the trial court's judgment.

No. 02-14-00286-CV, 2015 WL 5722833, at *4 (Tex. App.—Fort Worth Aug. 26, 2015, pet. denied) (mem. op.) (per curiam). Also, "[e]xcept as and to the extent the company agreement specifically provides otherwise, a member or manager is not liable for a debt, obligation, or liability of a limited liability company, including a debt, obligation, or liability under a judgment, decree, or order of a court." Tex. Bus. Orgs. Code Ann. § 101.114 (West 2012).

46. The summary judgment evidence establishes that the money was wired to Buffco.

47. On page 56 of Harleton's appellee's brief, Harleton also argues that Bufkin may be held individually liable because he signed the 2003 JOA in his individual capacity. However, Harleton's claims against the Buffco Defen-

dants for breach of the ROFR was denied, and Harleton failed to appeal the trial court's ruling on this point.

48. This is likely because "an officer or director [of a corporation] may not be held liable in damages for inducing the corporation to violate a contractual obligation, provided that the officer or director acts in good faith and believes that what he does is for the best interest of the corporation." *Pabich*, 71 S.W.3d at 508 (quoting *Maxey v. Citizens Nat'l Bank*, 507 S.W.2d 722, 726 (Tex. 1974)). "Even the officers and directors of an ordinary corporation, while acting as such, are not personally liable even though they recommend a breach of a valid contract." *Id.* (quoting *Maxey*, 507 S.W.2d at 726). In citing this caselaw, we are not concluding that Bufkin breached the Letter Agreement.