**REVERSE and REMAND; and Opinion Filed August 26, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-18-00394-CV

## QUALITY METRICS PARTNERS, LLC, CLEARVIEW DIAGNOSTICS, LLC, CGK CONSULTING, LLC, CGK MEDICAL MANAGEMENT, LLC, CGK MEDICAL VENTURES, LLC, BRODIE FLANDERS, MICHAEL MORALES, MICHAEL KNALL, ANTHONY KIM, AND CHRISTOPHER R. PEYTON, Appellants
## V.
## GREG BLASINGAME; CAPRICIA LARSON; GABBY CONSULTING, LLC; AND DX POWER MOVES CONSULTING, LLC, Appellees

### On Appeal from the 101st Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. DC-17-03702

## MEMORANDUM OPINION
Before Justices Brown, Schenck, and Pedersen, III
Opinion by Justice Pedersen, III

Appellants challenge the trial court's denial of their consolidated motions to compel arbitration of certain claims brought by appellees. In two issues, appellants contend that (i) the claims at issue fall within the scope of the agreement containing an arbitration provision, and (ii) three legal theories allow these appellants to compel arbitration of those claims. We reverse the trial court's order denying the motion to compel, render judgment ordering all disputes between the parties to proceed to arbitration, and remand for further proceedings consistent with this opinion.

## Background

This appeal involves a series of contractual relationships among the parties.

### The Parties

Appellant Quality Metrics Partners, LLC (QMP) provides marketing services, including sales and client acquisition to vendors of services and products of interest to health care providers. It owns and operates a laboratory, appellant Clearview Diagnostics, LLC (Clearview), which processes blood and urine samples. Individual appellants Brodie Flanders, Michael Morales, Michael Knall, and Anthony Kim are principals of both QMP and Clearview. In this opinion, we will refer to QMP, Clearview, Flanders, Morales, Knall, and Kim as the QMP Appellants.

Individual appellant Christopher Peyton is the Chief Executive Officer of CKG Consulting, LLC[1] and CGK Medical Ventures, LLC. In this opinion, we will refer to CGK, CGK Medical Ventures, LLC, and Peyton as the CGK Appellants.

Appellees Greg Blasingame and Capricia Larson are principals of DX Power Moves Consulting, LLC (DX Power) and its predecessor in interest, Gabby Consulting, LLC (Gabby). We refer to these four parties collectively as appellees.

### The Agreements

On November 18, 2015, QMP and CGK entered into their Representative Marketing Agreement. In that agreement, CGK agreed to provide information to physicians and other health care professionals and health care organizations regarding specific services and products of Clearview. QMP subsequently assigned its interest in the Representative Marketing Agreement to Clearview itself. The new agreement was titled the Marketing Services Agreement, and it continued all obligations relevant to this appeal.

---

[1] During the course of the parties' relationship, CGK Consulting, LLC changed its name to CGK Medical Management, LLC. "CGK" shall refer here to both entities.

Appellees contend that, during that same month, they entered into an oral contract with the QMP Appellants. Appellees agreed to market QMP and Clearview's services to appellees' health-care-provider clients. In return, appellees would receive 40% of QMP's and Clearview's gross collections after processing samples provided by appellees' clients.

And the same month, appellees contend, the QMP Appellants persuaded Gabby to enter a written agreement with CGK. That agreement, titled the Distribution Agreement, likewise provided that appellees would market Clearview's services to appellees' health-care clients. Under the written agreement, appellees would receive 40% of *CGK's* gross collections from Clearview's processing of appellees' clients' samples. The Distribution Agreement contains an arbitration provision, which states that disputes under or relating to the agreement will be submitted to arbitration.

*Proceedings Below*

After a year of business dealings among the parties, appellees sued all appellants. They alleged breach of the Distribution Agreement by CGK. And they pleaded claims against all appellants for conversion and civil threat, violations of the Texas Theft Liability Act, unjust enrichment/restitution, civil conspiracy, constructive trust, fraud, negligent misrepresentation, tortious interference with contract, and breach of fiduciary duty. Finally, they pleaded a claim of aiding and abetting against individual appellants Morales, Knall, Flanders, and Kim.

Appellants answered and then filed motions to compel arbitration pursuant to the Distribution Agreement's arbitration provision.

Days later, appellees filed their First Amended Petition, which added allegations of the existence and breach of a separate oral agreement with the QMP Appellants. The amended petition also claimed that the QMP Appellants had fraudulently induced appellees to enter into that oral agreement.

The motions to compel were heard together by the Associate Judge; she ordered arbitration of all claims against all appellants. Appellees appealed, and the trial court heard the motions de novo. The court granted the motions except as to direct claims against the QMP Appellants.

This appeal followed.

## Non-Signatories Compelling Arbitration

We begin with appellants' second issue, which argues that the QMP Appellants—who are not signatories to the Distribution Agreement—can nevertheless compel arbitration with appellees via any of three legal theories: third-party-beneficiary status, intertwined estoppel, and same-transaction agreements. Whether a claim involving a non-signatory must be arbitrated is a "gateway matter" for the trial court that is subject to de novo review on appeal. *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 629 (Tex. 2018).

"Arbitration is a creature of contract between consenting parties." *Id.* Nevertheless, principles of contract law and agency may require a party that agreed to arbitrate disputes with one party to arbitrate with another. *Id.* The parties before us agree that the Federal Arbitration Act (FAA) and federal law generally govern their case. But the United States Supreme Court has directed that we look to state law to determine whether contracts are binding and enforceable under the FAA when that state law would govern issues of "validity, revocability, and enforceability of contracts generally." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009). The *Carlisle* Court identified a list of state law principles that allow a contract to be enforced by or against nonparties to the contract: assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver, and estoppel. *Id.* at 631 (citing 21 Richard A. Lord, <u>Williston on Contracts</u> § 57:19, p. 183 (4th ed. 2001)). Thus, "[i]f a written arbitration provision is made enforceable against (or for the benefit of) a third party under state contract law, the [FAA's] terms are fulfilled." *Id.*

–4–

The QMP Appellants' first argument is that they are intended third-party beneficiaries of the Distribution Agreement. "A third party may enforce a contract it did not sign when the parties to the contract entered the agreement with the clear and express intention of directly benefitting the third party." *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011). We determine whether the contracting parties intended to benefit a third party directly by looking to the contract's language, construed as a whole. *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017). We are assisted in this effort by a relatively unusual example of contract drafting. The Distribution Agreement contains a clause specifically acknowledging that it intends such beneficiaries:

### THIRD-PARTY BENEFICIARY

The Distributor is aware that CGK acts as an independent contractor for multiple Service Providers. The services that the Distributor will be providing for CGK are also intended to benefit such Service Providers. As a result, the Distributor acknowledges that the Service Providers shall be considered to be a third party beneficiary of this Agreement. Consequently, the protections and benefits to CGK under this Agreement shall also be afforded to the Service Providers.

This clause identifies a category of parties—service providers—that are entitled to the protections and benefits of the Distribution Agreement. Certainly one of those protections or benefits is the right to compel arbitration in a dispute relating to the agreement. *In re NEXT Fin. Group, Inc.*, 271 S.W.3d 263, 267 (Tex. 2008) (intended third-party beneficiary may compel arbitration in accordance with terms of agreement).

The term "service providers," however, is not defined within the Distribution Agreement, and the parties disagree as to who is included within its ambit. Appellees argue that no QMP Appellant is specifically identified as a service provider, and they contend that—as between the QMP Appellants and CGK—if one is a service provider it would be CGK, who provides marketing services for those appellants. These arguments are unavailing. First, a third-party beneficiary need not be identified by name; identification of a class or category of parties is sufficient. *Freeman v. Harleton Oil & Gas, Inc.*, 528 S.W.3d 708, 746 (Tex. App.—Texarkana 2017, pet. denied). And

second, we cannot interpret the contract in a manner that would make a signatory (CGK) its own third-party beneficiary.[2]

Appellants contend that Clearview is a service provider under the Distribution Agreement. They contend further that QMP (as Clearview's predecessor in interest) and Morales, Knall, Flanders, and Kim (as agents of QMP and Clearview) are also service providers. Our primary concern in addressing appellants' arguments is to ascertain the true intention of the parties as it is expressed in the agreement. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). To that end, we "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of a contract so that none will be rendered meaningless." *Id.*

We begin with the third-party provision itself. This section affirms that appellees were aware at the time the agreement was made "that CGK acts as an independent contractor for multiple Service Providers." The agreements between CGK on the one hand, and QMP and Clearview on the other, state specifically that their relationship is one of independent contractor. And while it is true that CGK has provided marketing services for QMP and Clearview, it is equally true that Clearview provides laboratory services to CGK's clients. Indeed, those laboratory services are the source of the revenue within all of the contractual relationships implicated in this appeal. The third-party provision declares that "[t]he services that [appellees] will be providing for CGK are also intended to benefit such Service Providers." Certainly appellees' marketing services are intended to benefit Clearview directly and QMP, its owner, indirectly. It is difficult to posit what other parties would be benefitted by appellees' efforts; appellees point out in another context that the Distribution Agreement was not exclusive, but surely appellees' efforts were not intended

---

[2] Appellees also suggest that interpreting the Distribution Agreement to name the QMP Appellants as third-party beneficiaries would violate a provision in the Master Service Agreement prohibiting CGK's binding QMP or Clearview in any fashion. Of course appellees have no standing to complain of CGK's purported breach of that agreement. And if CGK actually violated the Master Service Agreement by creating the third-party beneficiary provision with the intention of its applying to QMP and Clearview, the latter have clearly waived any objection by moving to compel arbitration under that provision.

to benefit other marketers under CGK's direction, i.e., appellees' competitors. It appears, therefore, that the third-party provision would reasonably apply to QMP and Clearview if we look solely to that provision.

We are instructed, though, to look at the entire contract to determine the signing parties' intent. *See Coker*, 650 S.W.2d at 393. When we do so, it becomes apparent that the term "service provider" permeates the Distribution Agreement:

- appellees agreed not to influence clients and prospective clients of the service providers that CGK represents to seek products or services that compete with those marketed by CGK;[3]

- appellees agreed to provide workers' compensation insurance for their employees and to indemnify CGK and its service providers for claims arising out of employee injuries;[4]

- appellees agreed to indemnify CGK and its service providers from claims incurred because of appellees' breach of the Distribution Agreement;[5]

---

[3] Non-Exclusive Relationship. Distributor may represent, perform services for, and contract with as many additional clients, persons, or companies as Distributor, in Distributor's sole discretion, sees fit. Notwithstanding the preceding sentence, Distributor agrees to not, either directly or indirectly, influence CGK's clients or prospective clients, and the clients and prospective clients of the **service providers** CGK represents, to seek products or services that directly compete with the products or services provided and marketed by CGK, or either directly or indirectly influence CGK's clients or prospective clients to seek the same products or services offered by CGK, through another company, entity, or person.

Distributor Agreement § 4.1 (emphasis added).

[4] Insurance. Distributor agrees to provide workers' compensation Insurance for Distributor's employees and agents and agrees to hold harmless and indemnify CGK and its **service providers** for any and all claims arising out of any injury, disability, or death of any of Distributor's employees or agents. Distributor further agrees to maintain adequate amounts of general comprehensive liability insurance.

*Id.* § 4.3 (emphasis added).

[5] Indemnity. Distributor agrees to indemnify, defend, and hold CGK, and its **service providers** free and harmless from all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies, including interest penalties, attorneys' fees, and costs, that CGK and its **service providers** may incur as a result of a breach by Distributor of any representation or agreement contained in this Agreement.

*Id.* § 4.5 (emphasis added).

- appellees agreed to hold in confidence—and not to disclose without prior consent of CGK and its service providers—any proprietary information critical to CGK's or its service providers' business;[6]

- appellees recognized and agreed not to impair the interest or value of CGK and its service providers in their trademarks, service marks, and trade names;[7]

- appellees agreed that the contract could be terminated on thirty days' notice if appellees made a willful misrepresentation that was material to the operation of CGK or its service providers;[8] and

---

[6] Confidentiality. Distributor shall hold in the strictest confidence, and shall at no time, without the prior written consent of CGK, and its *service providers*, during this Agreement use for Distributor or others, or disclose to others, directly or indirectly, any confidential information, trade secrets or other proprietary matters critical in any way relating to CGK's and its *service providers* business, including without limitation, the names, representatives, or contact information of any of CGK's *service providers* (and names of their services), names of subject matter experts, proprietary technology, know·how, patent applications, business plans, budget, forecast, client and prospective client's confidential information and any information which has come to Distributor's attention during the course of Distributor's association with CGK, either prior to or after the Effective Date.

*Id.* § 5.0 (emphasis added).

[7] Use of Trademarks. Distributor recognizes CGK and its service providers right, title, and interest in and to all service marks, trademarks, and trade names used by CGK and its *service provider[s]*, and agrees not to engage in any activities or commit any acts, directly or indirectly, that may contest, dispute, or otherwise impair CGK and its *service provider[s']* right, title, and interest therein, nor shall Distributor cause diminishment of the value of said trademarks or trade names through any act or representation. Distributor shall not apply for, acquire, or claim any right, title, or interest in or to any such service marks, trademarks, or trade names or others that may be confusingly similar to any of them, through advertising or otherwise. Effective as of the termination of this Agreement. Distributor shall cease to use all of CGK and its *service provider[s']* trademarks, marks, and trade names.

*Id.* § 5.2 (emphasis added).

[8] Thirty (30) day Termination. This Agreement may be terminated on thirty (30) days prior written notice for the following reasons:

(a) A breach of any provision of this Agreement by the other party;

(b) Willful misrepresentation by the Distributor that is material to the operation of CGK, or its *service provider[s]*;

(e) Failure or refusal on the Distributor's part to comply with reasonable directives of CGK, or the written policies or procedures of CGK.

*Id.* § 6.2 (emphasis added).

- appellees agreed that the contract could be terminated immediately by CGK for "malicious misconduct" detrimental to CGK or its service providers or embezzlement of monies belonging to CGK or its service providers.[9]

Within the Distribution Agreement, thus, "service providers" are clearly entities or individuals whose work is bound up with CGK's work. At each place in the agreement that CGK requires protection from Gabby, it requires that its service providers be protected as well.

It is undisputed that CGK's work was bound up with QMP and Clearview. The Master Services Agreement, which embodied and controlled their relationship, obligated CGK to provide the medical community information regarding the toxicology and blood lab services of Clearview. We conclude that Clearview and its predecessor in interest and owner, QMP, have precisely the relationship with CGK that is suggested by the multiple references to service providers throughout the Distribution Agreement.

Finally, this construction of the Distribution Agreement aligns with appellees' factual allegations concerning the origins of the Distributor Agreement. According to appellees, the oral agreement between them and the QMP Appellants was insufficient to effectuate their relationship entirely. Instead, the QMP Appellants asked appellees to enter into the Distribution Agreement with CGK, saying it was customary for all their marketing groups, like appellees, to execute a written distributor agreement with CGK. Appellees' allegation suggests that CGK acted in some fashion as an overseer of entities providing marketing services for Clearview. It would be

---

[9] Immediate Termination. This Agreement may be terminated immediately by CGK, for the following reasons:

(a) A breach of Section 4.1 of this Agreement by the Distributor;

(b) Malicious misconduct that is detrimental to CGK, and its *service provider[s]* (including Affiliated; or

(c) Embezzlement of monies belonging to CGK or its *service provider[s]*.

(d) Failure to maintain working relationship with Medical Professionals.

*Id.* § 6.3 (emphasis added).

reasonable for QMP and Clearview to require their interests to be protected in those marketers' agreements. We conclude the parties to the Distributor Agreement intended QMP and Clearview, as service providers to the CGK Appellants, to be third-party beneficiaries of that agreement.

Because QMP and Clearview are third-party beneficiaries of the Distribution Agreement, their agents are as well. *See Ascendant Anesthesia PLLC v. Abazi*, 348 S.W.3d 454, 462 (Tex. App.—Dallas 2011, no pet.) ("When the principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are covered by that agreement."). Thus, the individuals who are principals of both QMP and Clearview—Morales, Knall, Flanders, and Kim— are also entitled to the protection and benefit of the arbitration agreement.

We conclude the QMP Appellants are entitled to compel arbitration under the arbitration clause contained within the Distribution Agreement. We sustain appellants' second issue.

**Scope of the Arbitration Clause**

Our next inquiry, based on appellants' first issue, asks whether the claims appellees urge against the QMP Appellants fall within the scope of the Distribution Agreement's arbitration clause. We review de novo the trial court's ruling that the arbitration provision in the Distribution Agreement does not apply to any claims asserted directly against the QMP Appellants. *See Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018) (whether claims in dispute fall within scope of valid arbitration agreement is question of law, which is reviewed de novo).

Appellants argue that all of appellees' claims fall within the scope of the arbitration agreement. It is undisputed that claims against the CGK Appellants must be arbitrated: those parties are signatories or agents of signatories. *See Abazi*, 348 S.W.3d at 462 ("[E]xtending the scope of an arbitration provision to an agent of the party who signed the agreement furthers the federal policy of favoring arbitration and the parties' intent to provide a single forum to resolve disputes arising under an agreement."). And appellees concede that their "claims against the QMP

Appellants that are derivative of CGK Appellants' liability or where QMP Appellants would be vicariously liable for conduct of CGK Appellants, such as conspiracy or aiding and abetting, [] are within the scope of the arbitration provision in the Distributor Agreement." But appellees contend that their direct claims against the QMP Appellants do not rely on the terms or the existence of the Distribution Agreement, and thus those claims are not within the scope of the arbitration provision. We disagree.

Under the FAA, ordinary principles of state contract law determine whether parties agreed to arbitrate a certain matter. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). The scope of an arbitration agreement must be broadly interpreted in light of the federal policy favoring arbitration. *In re NEXT Fin. Group*, 271 S.W.3d at 267. The arbitration clause in the Distribution Agreement states:

### **ARBITRATION OF DISPUTES**

In the event of any dispute under or relating to the terms of this Agreement, or breach thereof, it is agreed that the same will be submitted to arbitration in Dallas, Texas. Any judgment upon the award rendered by the arbitrator(s) may be entered in any court, state or federal, having jurisdiction thereof.

Courts employ a strong presumption in favor of arbitration when deciding whether claims fall within an arbitration agreement. *In re Rubiola*, 334 S.W.3d 220, 225 (Tex. 2011) (orig. proceeding). This presumption particularly applies when the clause is characterized legally as "broad." *In re Signor*, No. 05-16-00703-CV, 2017 WL 1046770, at *4 (Tex. App.—Dallas Mar. 20, 2017, no pet) (mem. op.). We have concluded that "similar arbitration provisions that employ terms like 'any dispute' and 'relating to' are broad arbitration clauses capable of expansive reach and create a presumption of arbitrability." *Id.* at *6. The arbitration clause in this case employs both of those terms. We conclude as a threshold matter that the arbitration clause is broad within the meaning of federal and Texas law.

A broad arbitration clause, however, is not limitless. We determine whether claims fall within the scope of the clause by focusing on the factual allegations of the petition, not the legal causes of action asserted there. *In re Rubiola*, 334 S.W.3d at 225. "Generally, if the factual allegations 'touch matters,' are 'factually intertwined,' have a 'significant relationship' to, or are 'inextricably enmeshed' with the contract containing the arbitration provision, the claim is arbitrable." *In re Signor*, 2017 WL 1046770, at *4. Moreover, even if some claims are not otherwise arbitrable, they can become arbitrable when factually intertwined with arbitrable claims. *Abazi*, 348 S.W.3d at 462.

Appellees' factual allegations are set forth in their First Amended Petition. Among those allegations are:

> In November 2015, members of Clearview and QMP solicited appellees to enter into an oral agreement, which involved appellees bringing their book of business (i.e. their client doctors and their blood and urine samples) to Clearview and QMP. In exchange, appellees would receive 40% gross of all collections. Clearview and QMP would cover all expenses, handle the accounting, process the samples, and split the other 60%.

> Clearview and QMP represented and marketed their "state of the art" and unrivaled collection and billing process, which they guaranteed: would bring appellees significant profits; showed a bill collection rate drastically higher than industry norms and billing practices that allowed them to bill and process samples faster and more efficiently than any competitor; and would allow appellees and their clients to log-in to an online portal and track the processing of samples in real time and also trace the gross and net revenues from their partners.

> Clearview and QMP also represented that the Clearview lab was properly registered with all the major insurance companies and licensed to take both in-network and out-of-network samples.

> At a dinner attended by Kim, Flanders, Knall, and Morales, the QMP Appellants repeated these representations and assured and promised appellees that their business venture would be extremely profitable, generating substantial returns because of their organization in accounting, insurance, and projected revenue.

> Based on these representations made by the members of QMP and Clearview, appellees began taking all of their clients to the Clearview laboratories to promote Clearview's and QMP's business and registering their clients with Clearview's laboratories.

Also in November of 2015, Morales, Flanders, and Knall introduced Peyton, the CEO of CGK, to appellees. QMP and Clearview asked appellees to execute a written distributor agreement with CGK, separate from the partnership agreement with QMP and Clearview. They stated it was customary to have all marketing groups, like appellees, also execute a written distributor agreement with Peyton and his company, CGK. Under this agreement, appellees were to perform marketing services for CGK and bring in business by securing clients and specimens and referring clients to CGK. Appellees were to receive 40% of the gross collections after all samples were billed to the health insurance payors.

Over the next calendar year, per the terms of the two agreements, appellees sent millions of dollars' worth of samples to appellants, but appellants' prior representations and promises turned out to be false and grossly misleading.

In addition, over the following year, appellants' misrepresentations and omissions included:

> 1. Appellants allegedly failed to collect any money in January and February of 2016 because "they failed to register with the Insurance payors" despite the prior representations they had properly done so;

> 2. Despite appellees' repeated requests, appellants refused to provide them with basic information and failed to properly account for their profits;

> 3. Appellants violated the terms of their agreements by doing side deals and unilaterally changing the terms and payment structure of the agreement multiple times without appellees' consent;

> 4. Clearview was not a licensed in-network provider as they represented; and

> 5. On information and belief, appellants were hiding money, holding collections, and using separate billing agents so they did not have to report the samples to appellees with the others, or simply sending them out to other agents to run and bill and not reporting them to appellees.

Appellees argue that the facts underlying the two agreements—their oral agreement with the QMP Appellants and their Distribution Agreement with the CGK Appellants—are entirely different. We cannot agree. Appellees rely upon the same fundamental representations, including projected billable and collection rates, the QMP Appellants' licenses, and the capabilities of the Portal system, to state their fraudulent inducement claim against the QMP Appellants and their negligent misrepresentation claim against all appellants. Appellees plead two breach of contract claims, but both identify the breach as the failure to pay what was owed appellees. And what was

owed appellees under both agreements was the same 40% of gross collections by all appellants. Appellees plead a total amount of samples they submitted to appellants; they do not identify any damages that purportedly flow from one group of appellants as opposed to the other. We conclude that appellees' allegations regarding misrepresentations and breaches of the agreements are factually intertwined with the Distribution Agreement and are factually intertwined with identical claims against the CGK Appellants. Accordingly, we conclude those claims are arbitrable. *See In re Signor*, 2017 WL 1046770, at *4 (claims factually intertwined with the contract); *see also Abazi*, 348 S.W.3d at 462 (claims factually intertwined with arbitrable claims).

We conclude further that the arbitration provision applies to appellees' tort claims. The factual allegations underlying all of the tort claims involve appellants' failure to remit the identical payments allegedly due pursuant to the oral contract and the Distribution Agreement. "Texas courts have construed similar broad language in arbitration provisions to encompass tort claims." *AdvoCare GP, LLC v. Heath*, No. 05-16-00409-CV, 2017 WL 56402, at *6 (Tex. App.—Dallas Jan. 5, 2017, no pet.) (mem. op.).

We conclude that appellees' direct claims against the QMP Appellants fall within the scope of the Distribution Agreement's arbitration provision. We sustain appellants' first issue.

**Conclusion**

We have decided both of appellants' issues in their favor. Accordingly, we reverse the trial court's order denying the motion to compel direct claims against the QMP Appellants to

–14–

arbitration. We render judgment ordering all disputes between these parties to proceed to arbitration, and we remand for further proceedings consistent with this opinion.

/Bill Pedersen, III/
BILL PEDERSEN, III
JUSTICE

180394F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

QUALITY METRICS PARTNERS, LLC, CLEARVIEW DIAGNOSTICS, LLC, CGK CONSULTING, LLC, CGK MEDICAL MANAGEMENT, LLC, CGK MEDICAL VENTURES, LLC, BRODIE FLANDERS, MICHAEL MORALES, MICHAEL KNALL, ANTHONY KIM, AND CHRISTOPHER R. PEYTON, Appellants

No. 05-18-00394-CV     V.

GREG BLASINGAME; CAPRICIA LARSON; GABBY CONSULTING, LLC; AND DX POWER MOVES CONSULTING, LLC, Appellees

On Appeal from the 101st Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-17-03702.
Opinion delivered by Justice Pedersen, III. Justices Brown and Schenck participating.

In accordance with this Court's opinion of this date, the order of the trial court is **REVERSED** and judgment is **RENDERED** ordering all disputes between these parties to proceed to arbitration.

The case is **REMANDED** for further proceedings consistent with this opinion.

It is **ORDERED** that appellants Quality Metrics Partners, LLC, Clearview Diagnostics, LLL, CGK Consulting, LLC, CGK Medical Management, LLC, CGK Medical Ventures, LLC, Brodie Flanders, Michael Morales, Michael Knall, Anthony Kim, and Christopher R. Peyton recover their costs of this appeal from appellees Greg Blasingame; Capricia Larson; Gabby Consulting, LLC; and DX Power Moves Consulting, LLC.

Judgment entered this 26th day of August, 2019.